Tony AVIRGAN, and Martha Honey, Plaintiffs,

v.

John HULL, Bruce Jones, Rene Corbo, Felipe Vidal Santiago, Moises Dagoberto Nunez, Francisco Chanes, Ramon Cecilio Palacio, Ricardo Gris, William Gris, Roger Lee Pallais, Amac Galil, Hector Cornillot, Jorge Gonzalez, Adolfo Calero, Alvaro Cruz, Frederico Saenz, Robert W. Owen, John K. Singlaub, Ronald Joseph Martin, Sr., James McCoy, Thomas Posey, Rafael "Chi Chi" Quintero, Mario Delamico, Thomas Clines, Theodore Shackley, Albert Hakim, Richard Secord, Pablo Escobar, and Jorge Ochoa, Defendants.

No. 86–1146–CIV.

United States District Court,
S.D. Florida,
Miami Division.

June 23, 1988.

The Christic Institute, Thomas Kellenberg, Catholic University of America, Columbus School of Law, Washington, D.C., David A. Snyder, Miami, Fla., for plaintiffs.

Fitzgerald, Portela & Portunodo, Wood, Lucksinger & Epstein, Miami, Fla., for Adolfo Calero.

Milledge, Iden & Snyder by Allan Milledge, Florence Beth Snyder, Miami, Fla., for Rafael "Chichi" Quintero, Thomas Clines, Richard Secord, Albert Hakim.

Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A. by Curtis Carlson, Miami, Fla., for Thomas Posey.

Spencer, Bernstein, Seemann & Klein, Miami, Fla., William Henry Stiles, V, Key Biscayne, Fla., Law Offices of John P. Sears, Philip J. Hare, Washington, D.C., for John Singlaub.

Jack McKay, P.C., Washington, D.C., Alley, Maass, Rogers, Lindsay & Chauncey by George P. Ord, Palm Beach, Fla., for Theodore Shackley.

Fine, Jacobson, Schwartz, Nash, Block & England, P.A. by Theodore Klein, Miami, Fla., for James McCoy, Mario Delamico.

Robert W. Owen, Washington, D.C., pro se.

Bruce Jones, Lutz, Fla., pro se.

Diaz, Silveira & Associates, P.A., Coral Gables, Fla., for Jorge Gonzalez.

Robert F. Garcia–Esquerro, Coral Gables, Fla., for Rene Corbo.

Zuckerman, Spaeder, Taylor & Evans by John F. Evans, Coral Gables, Fla., for Andy Messing.

Luis S. Konski, Walton Lantaff Schroeder & Carson, Miami, Fla., for Moises (Dagoberto) Nunez.

## OPINION GRANTING SUMMARY JUDGMENTS

JAMES LAWRENCE KING, Chief Judge.

The thundering explosion of a bomb shattered the evening air at the river bank camp of the Southern Contra Force led by

Commendante Eden Pastora. A group of approximately 30 journalists had travelled for hours by canoe, up a steaming jungle river to reach the guerilla camp known as La Penca.

Plaintiffs, one of whom is a journalist who survived the explosion that left eight dead and numerous wounded, accuse the 29 defendants of causing this bombing. They alleged that this bombing was only one act of criminal RICO enterprise consisting of all of the defendants whose purpose was to overthrow the Government of Nicaragua. Plaintiffs seek damages for their personal injuries resulting from the bombing and for interference with their subsequent investigation of the bombing tragedy.

The Plaintiffs are reporters who, while working for various news agencies, cover Central America. As part of this assignment, the Plaintiff Tony Avirgan covered the La Penca press conference held by the Contra leader Eden Pastora.

All defendants deny plaintiffs' allegation of the existance of a RICO conspiracy or any involvement with the bombing and assassination attempt. Thirteen defendants [1] have moved for summary judgment on the basis that plaintiffs, after all discovery has been concluded, have failed to establish that the alleged assassination attempt was connected in any way with these defendants or that they caused any loss or injury to the plaintiffs. These Defendants include alleged Central Intelligence Agency operatives, military intelligence personnel, mercenaries, arm merchants and Colombian drug lords. The principal allegations of the complaint focus on Nicaragua, but it also touches upon some alleged anti-Communist operations in Cuba, Southeast Asia, Iran and Libya.

## I. The Conspiracy Allegation of the Complaint and the Order Setting Guidelines for Discovery

The plaintiffs specified May 1983 as the commencement of the alleged conspiracy and its continuance through the filing of the original complaint on May 29, 1986. Each and every allegation pertaining to the La Penca bombing and those matters surrounding the alleged involvement of the defendants in the events then taking place in Nicaragua (set forth in paragraphs 38 to 74 of the amended complaint of October 3, 1986) are alleged to have occurred between May 1983 and May 29, 1986. See Amended Complaint pp. 13–25.

The court, after hearing in oral argument the respective positions of the parties, established limitations and guidelines for discovery on July 30, 1987. The limitation was both to time and subject matter. The time limit was the time specified by plaintiffs in their amended complaint as being the time frame of the alleged conspiracy plus six months before the first alleged overt act of May 1983. The parties were limited in their discovery to a four year period covering the relevant alleged conspiratorial time period of December 1982 until November 1986. The subject matter limitation revolved around discovery arising out of the alleged events in Central America, the purchase or sale of military equipment, weapons or explosives, transactions in illegal drugs, the operation of the alleged Neutrality Act enterprise and any action resulting in or causing any injury to the plaintiffs, specifically including the La Penca bombing. Full and complete discovery for the time and subject matter alleged by the plaintiffs has been permitted.

The plaintiff's contend that they should have been permitted to conduct worldwide discovery concerning the activities of the

---

**1.** The following defendants have either in fact or through stipulation of counsel timely filed motions for summary judgment: Jones, Owen, Hull, Calero, Singlaub, Shackley, Martin, McCoy, Quintero, Delamico, Clines, Hakim, and Secord. The defendant Gonzalez filed an untimely summary judgment motion to which the plaintiffs objected.

Six defendants were never served and were dismissed. These are Vidal, Palacio, Galil, Cruz, Escobar and Ochoa.

Nine defendants have not moved for summary judgment. They are Corbo, Nunez, Chanes, R. Gris, W. Gris, Pallais, Cornillot, Saenz and Posey. Nunez has moved, after the pretrial conference, to vacate the entry of default against him and quash the service of process made to him.

defendants prior to December 1982 in Cuba, Southeast Asia, Iran, and Libya. Some of these events occurred as far back as 1959.

■ Plaintiffs are bound by the allegations of their complaint wherein they designated the date of commencement of the enterprise as May 1983. If the plaintiffs cannot demonstrate by admissible and competent proof that these defendants injured them as alleged in the complaint, then they have no case cognizable under the RICO Statute and no right to discovery pre 1982. Absent such a showing, it is completely immaterial to any issue in this law suit whether the defendants were, or were not, involved in some other enterprise at some other time in Cuba, Southeast Asia, Iran or Libya. To have permitted them to inquire into every facet of the lives of the defendants for the past thirty years, without first requiring plaintiffs to show that defendants injured the plaintiff at the La Penca bombing would be wrong.

The defendant Shackley has twice sought summary judgment upon the basis that no evidence had been developed during the discovery phase of this litigation to sustain any of the allegations brought by the plaintiffs against him. In each instance the plaintiffs defended on the basis that additional time for discovery was required and that Mr. Shackley's motions were premature since the parties had until the pretrial conference date within which to complete all discovery. The court denied these motions, agreeing with plaintiffs that they should have up until the cutoff of all discovery (the pretrial conference date) within which to adduce all relevant facts.

The plaintiffs have been given the broadest possible time for discovery of the facts relevant to the issues relating to the Le Penca bombing, the events of Nicaragua and the overt acts alleged in the amended complaint. The plaintiffs have had two years to develop facts to support the allegations of their complaint, during which over 20 depositions have been taken, dozens of sets of interrogatories propounded and numerous affidavits filed.

## II. *The Causes of Action*

The complaint sets forth eight causes of action. The gravamen of these counts is one claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1986). The complaint also sets forth seven state claims, six arising under Florida common law and one under the Florida RICO statute.

### A. The RICO Claim.

The core of the Plaintiffs complaint rests upon 18 U.S.C. § 1964(c), which has been termed civil RICO. This section provides

(c) Any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefore in any appropriate United States District Court and shall recover threefold damages he sustains and the cost of the suit including a reasonable attorneys fee.

From this language, the Plaintiff must prove three essential elements. *See Wilcox Development Company v. First Interstate Bank of Oregon*, 97 F.R.D. 440–447 (D.Or.1983). The first element is a violation of 18 U.S.C. § 1962. The second requirement is causation; that is, a direct injury of the plaintiffs from such violation. The third requirement is damages sustained by the Plaintiffs. *Id.* at 446.

Title 18, U.S.C. § 1962 establishes four violations. A Defendant violates § 1962(a) if that person receives any income derived directly or indirectly from a pattern of racketeering activity and uses or invests directly or indirectly any part of this income or the proceeds of this income to acquire any interest in or establish or operate an enterprise that is engaged in or the activities of which effect interstate or foreign commerce. A defendant violates § 1962(b) by acquiring or maintaining through a pattern of racketeering activity any interest in or control of any enterprise which is engaged in or the activities of which affect interstate or foreign commerce. A defendant violates § 1962(c) if that defendant is employed by or associated with any enterprise engaged in or the activities of which effect interstate or foreign commerce and that defendant con-

ducts or participates directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity. A defendant violates § 1962(d) if he conspires to violate any of the provisions of subsection (a), (b) or (c).

The three essential terms of § 1962, an enterprise, a pattern, and racketeering activity, are defined in § 1961. An enterprise "includes any individual, partnership, corporation, association or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(1), (4). Any pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years, excluding any period of imprisonment after the commission of a prior act of racketeering activity". 18 U.S. C. § 1961(1), (5). Racketeering activity is defined by reference to numerous federal and state felonies as delineated by statute or common law. 18 U.S.C. § 1961(1)(A)–(D).

In its generic form the causation requirement is relatively straight forward. Section 1964(c) only requires that the plaintiff be injured by reason of a violation of § 1962. Clearly, the statute imposes a proximate cause requirement on the plaintiffs. *See Haroco v. American Bank & Trust Co. of Chicago,* 747 F.2d 384, 398 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). This simply requires that the criminal conduct in violation of § 1962 must directly or indirectly have injured the plaintiffs' business or property. *Id.*

With respect to the manner in which a violation of a particular subsection of § 1962 causes the Plaintiff's injury, the analysis becomes complicated. As with all causation issues the central focus must be placed upon how tenuous the causation link can or should be. This question varies from one subsection of § 1962 to another.

Two views exist with respect to causation under § 1962(a). The first view requires that the defendants' injury be caused by the use or investment of the income derived through the pattern of racketeering activity. *See Eastern Federal Credit Union v. Peat, Marwick, Mitchell & Co.,* 639 F.Supp. 1532 (D.Mass.1986); *Heritage Insurance Co. v. First National Bank of Cicero,* 629 F.Supp. 1412 (N.D.Ill. 1986). The second view is broader. Under this analysis a plaintiff's injury may be caused by the operation of the enterprise in which the defendant invested the proceeds derived from the pattern of racketeering activity. See *Blue Cross of Western Pennsylvania v. Nardone,* 680 F.Supp. 195 (W.D.Penn.1988).

The analysis of Judge Spencer in *Nardone* is correct. The language of § 1962(a) prohibits the use or investment of the income or proceeds derived from a pattern of racketeering "in the acquisition of any interest in or the establishment or operation of any enterprise ...". This language indicates the intent of Congress to reach all situations where someone may benefit from conducting a pattern of racketeering activity. Accordingly, a defendant's conduct can injure a RICO plaintiff if that plaintiff is injured by the use or investment of income or proceeds derived from the pattern or, if that plaintiff is injured by the operation of the enterprise in which the defendant used or invested the income or proceeds. This construction is consistent with the dictate of Congress to liberally construe the RICO statute. See *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

The causation link of § 1962(b) is direct. The plaintiff must be injured by the defendant's pattern of racketeering activity, that was used to either acquire or maintain any interest in or control of, any enterprise. Accordingly, the plaintiff must be injured by the pattern of racketeering activity committed by the defendant.

The causation requirement for § 1962(c) is more complicated. Initially, the plaintiff needs to be injured by the pattern of racketeering activity. The determination of which defendant actually caused the plaintiff's injury is more difficult.

Mere association with a RICO enterprise is not enough to establish liability. See

*Nassau Suffolk Ice Cream v. Integrated Resources,* 114 F.R.D. 684, (S.D.N.Y.1987). The statute requires that the defendant's participation be in the conduct of the affairs of a RICO enterprise. *Id.* at 691. The Second Circuit has found that a party conducts a racketeering activity when the party is either able to commit the predicate offenses solely by virtue of his position in the enterprise, or involvement or control over the affairs of the enterprise, or the predicate offenses are related to the activities of that enterprise. *See United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert.* denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981).

■ The causation link, therefore, requires a showing that the plaintiff was injured as a result of the conduct of the enterprise by the defendant. At the very least this requirement mandates a showing that the defendant was a member of the enterprise, and that the enterprise conducted the racketeering activity that injured the plaintiff.

All injuries are not necessarily remedied by RICO. In this Circuit a plaintiff must make a showing that it has suffered injury to its property or business. *See Grogan v. Platt,* 835 F.2d 844 (11th Cir.1988).

As this court found in its January 30, 1987 order denying motions to dismiss the second amended complaint, plaintiffs had sufficiently alleged a cause of action under RICO. Because at the summary judgment stage a plaintiff must make a showing that there is a genuine issue of material fact with respect to the allegations made in the complaint, the court now reviews the allegations made. In so doing the court will start with the injury requirement and then proceed to the violations of § 1962.

Tony Avirgan is alleged to have suffered personal injury, damage to his television camera equipment, and loss of business by reason of the bombing and the defendants pattern of racketeering activity committed thereafter.

The plaintiff alleges that these injuries were the result of the acts of all these defendants. The plaintiff alleges that Per Anker Hansen a/k/a Amac Galil, actually placed and exploded the bomb at the La Penca conference while hired by an enterprise consisting of all the defendants. This enterprise, it is alleged, also threatened to kidnap and murder "David" and Carlos Rojas Chinchilla. These individuals had been giving information about the bombing to plaintiffs. *See* Second Amended Complaint, paragraphs 53 and 54. The plaintiffs further allege that the defendants, members of the enterprise, have threatened to murder both of them. *Second Amended Complaint,* paragraph 55. While asserting liability against all, those defendants alleged to be specifically responsible for the threats and other acts occurring after the La Penca bombing are Hull, Vidal, Chanes, Nunez, Cruz, Saenz, Posey and Owen.

Plaintiffs maintain that the defendants have violated various subsections of 18 U.S.C. § 1962. It is the theory of plaintiff's case that the defendants established an enterprise, the purpose of which was to violate the principles espoused in the Neutrality Act and that all of the alleged patterns of racketeering activity were performed to promote the goal of this enterprise. Central to the alleged violations of each subsection of § 1962 is the plaintiffs' purported Neutrality Act enterprise. The plaintiffs allege that in May, 1983 the defendants Francisco Chanes, Moises Nunez, Hector Cornillot, Rene Corbo and Felipe Vidal Santiago established an enterprise. The purpose of the enterprise was to launch a Cuban/American mercenary expeditionary force against the Republic of Nicaragua, from Costa Rica, along the "Southern Front."

The plaintiffs also contend that these defendants established a cocaine smuggling operation through Costa Rica to finance the workings of this enterprise in violation of the Neutrality Act. 18 U.S.C. § 960 (1986). It is asserted that the original purpose of these individuals was to assist an indigenous Nicaraguan group, the Revolutionary Democratic Alliance ("ARDE").

The ARDE was engaged in guerilla attacks against Nicaragua under the leader-

ship of Eden Pastora. The plaintiffs maintain that sometime after this original joinder of forces the enterprise decided to remove Pastora as leader of ARDE in order to merge ARDE into alliance with the Honduras based contra group, the Nicaraguan Democratic Force ("FDN") and facilitate its narcotics trafficking in Costa Rica.

According to the complaint, the defendants Vidal and Corbo travelled to Costa Rica in May of 1983 to meet with defendants John Hull and Bruce Jones at Hull's ranch.

It was on this occasion that Hull and Jones, who allegedly had participated in anti-Nicaraguan military activities with the ARDE, joined the Neutrality Act enterprise and participated in the alleged decision to overthrow Pastora's leadership of the ARDE.

Plaintiffs further contend that in August of 1983 defendants Vidal, Nunes and Corbo, Cornillot, Chanes, Hull and Jones recruited the noted Medellian cocaine cartel members Pablo Escobar and Jorge Ochoa.

Avirgan and Honey assert that Ochoa and Escobar joined the enterprise and agreed to provide hundreds of pounds of Columbian cocaine in order to finance the activities of the enterprise in Costa Rica and Nicaragua.

Between December 1983 and February 1984 the defendants Jorge Gonzalez, Ramon Cecilio Palacio, Ricardo Gris, William Gris Adolfo Calero allegedly joined the Neutrality Act enterprise for the purpose of accomplishing the murder of Eden Pastora.

The plaintiffs allege that the enterprise sent the defendants Ricardo Gris and William Gris to Chile where they met and hired the defendant Amac Galil to murder Eden Pastora. The plaintiffs contend that the purpose of this action was to take over the leadership of ARDE.

Between March 1984 and May 1984 the plaintiffs contend that several other significant and important figures in the Iran Contra affair joined this enterprise. James McCoy, Mario Delamico and Ronald Joseph Martin, Sr. are alleged to have joined the

enterprise. Avirgan and Honey believe these three defendants unlawfully purchased, through both the defendant McCoy's business (R & M Equipment, Inc.) and defendant Martin's business (Tamiami Gun Ship), arms, C–4 explosives, ammunition and military equipment. The plaintiffs maintain that these weapons were intended to be used by the enterprise for terrorist activities, murder and arson. Also during this time, the plaintiffs contend that the defendants Theodore Shackley, Thomas Clines, Richard Secord, Albert Hakim and Rafael "Chi Chi" Quintero joined the enterprise and purchased and transported arms and explosives through their businesses the Orca Supply Company and CSF Investments Ltd. John K. Singlaub and Robert Owen allegedly joined the enterprise and operated through four organizations: Gray & Co., IDEA, Inc., the United States Council on World Freedom, and the World Anti-Communist League. The plaintiffs believed these organizations provided money for explosives and arms to be used in Nicaragua.

Sometime around the beginning of May 1984, the enterprise focused in on its planned assassination of Eden Pastora. The plaintiffs contend that the defendants Roger Lee Pallais, Frederico Saenz and Alvaro Cruz planned the attack on the Pastora press conference intending that members of the press be injured and the government of Nicaragua blamed, so as to achieve the dual purpose of attracting greater negative publicity against the government of Nicaragua and eliminating Pastora.

On May 30, 1984 the plaintiffs allege the defendant Galil (a/k/a Hansen) acting as an agent of the enterprise, placed and detonated a bomb at the press conference held by Eden Pastora at La Penca, Nicaragua. Tony Avirgan was injured and his camera equipment destroyed when this bomb exploded. Pastora survived the blast but six of his soldiers and three civilian journalists did not. A number of people, including Pastora, were seriously injured.

The next activity occurred in December of 1984, when plaintiffs allege Thomas Po-

sey of the Civilian Material Assistance ("CMA") joined the enterprise and met with Vidal, Corbo, Hull and Owen in Houston and Miami to form a second conspiracy to murder Eden Pastora.

Avirgan and Honey further allege that between December 1984 and July 1985 the defendants Corbo, Vidal, Hull, Jones, Posey, Palacio, Pallais, Cruz and Saenz conspired to murder the United States Ambassador to Costa Rica, Lewis Tambs. C–4 explosives were to be placed in an electrical box at the U.S. Embassy in San Jose, Costa Rica with the operation financed by monies received from the defendant Escobar's drug operations.

Between May and July 1985 the enterprise allegedly kidnapped and murdered plaintiffs' informant news source, "David". This man was an employee of the enterprise who gave plaintiff Avirgan information concerning the purpose and methods of the enterprise. A second news source of the plaintiffs Carlos Rojas Chinchilla, who helped the plaintiffs communicate with David, was allegedly kidnapped and threatened.

Finally, the plaintiffs allege that the activities of the enterprise continue to this present day with threats directed against them personally and with the continued smuggling of cocaine into the United States from Costa Rica.

Central to the alleged violations of § 1962 are the contended acts of racketeering. The plaintiffs allege that 37 types of racketeering activity were carried out by these defendants. Because the type of racketeering activity carried out by each defendant varies greatly, the court will discuss these allegations in detail.

The first alleged act of racketeering activity was the attempted murder of Eden Pastora. The plaintiffs contend that pursuant to this crime of violence the defendants Hull, Calero, Singlaub, Shackley, Martin, McCoy, Quintero, Delamico, Clines, Hakim and Secord engaged in foreign travel and communications in violation of 18 U.S.C. § 1952(a)(2).

The second act of racketeering activity was the murder of the eight persons at the press conference where the attempted assassination of Eden Pastora occurred. Plaintiffs contend that Hull, Colero, Singlaub, Shackley, Martin, McCoy, Quintero, Delamico, Clines, Hakim and Secord engaged in foreign travel and communications in violation of 18 U.S.C. § 1952(a)(2) pursuant to this end.

The third act of racketeering activity allegedly involves the same La Penca bombing and the attempted murder of the plaintiff Avirgan. Pursuant to this crime the same defendants engaged in foreign travel and communication in violation of the same provisions.

The following acts of racketeering activity are alleged to have been committed only by the defendants Hull and Owen:

the kidnap of Carlos Rojas Chinchilla in violation of 18 U.S.C. § 1951(a);

the kidnap and threatened violence against David in violation of 18 U.S.C. § 1951(a);

the threatened murder of Carlos Rojas Chinchilla in violation of 18 U.S.C. § 1951(a);

the threats to murder David in violation of 18 U.S.C. § 1951(a);

the murder of David in violation of 18 U.S.C. § 1951(a);

the threats to murder plaintiff Avirgan in violation of 18 U.S.C. § 1503 and 1951(a);

the threats to murder plaintiffs Honey and both plaintiffs' children and office employees in violation of 18 U.S.C. § 1503 and § 1951(a);

the participation in narcotics trafficking in violation of 18 U.S.C. § 1952(a) and the transfer of proceeds from narcotics trafficking in violation of 31 U.S.C. § 5311 to 5312.

The plaintiffs next allege that the defendants Owen, Hull, Colero, Singlaub, Shackley, Martin, McCoy, Quintero, Delamico, Clines, Hakim, and Secord trafficked in arms and explosives in violation of state and federal law including 18 U.S.C. §§ 842(a)(3) and 922(b)(5).

The plaintiffs next contend that defendants Martin, Secord, Shackley, Clines, Hak-

im and McCoy, transferred funds derived from illegal dealing in weapons and explosives in violation of 31 U.S.C. § 5311 to 5322.

The plaintiffs next contend that the defendants Owen, Hull, Colero, conspired on two occasions to murder Eden Pastora.

Plaintiffs then contend that defendants Hull and Owen conspired to kidnap both Carlos Rojas Chinchilla and David, and to murder David. These two defendants are also alleged to have conspired to transport cocaine and other illegal drugs into the United States.

The plaintiffs then contend the defendants Martin, Quintero, Delamico, Clines, Shackley, Secord, Hakim and McCoy conspired to facilitate the transport of cocaine into the United States by accepting the proceeds from illegal sales of narcotics in payment for illegal arms shipments.

The plaintiffs next contended the defendant Hull conspired to murder the United States ambassador to Costa Rica by exploding a bomb at the United States Embassy in Costa Rica.

Plaintiffs conclude the description of the types of racketeering activity by alleging joint participation in several criminal adventures that they contend shows an enduring pattern of joint racketeering activity through a continuity of relationship between the defendants. A description of these criminal ventures follows.

The first criminal venture is alleged to have occurred between June 1961 and July 1962. The defendants Shackley, Clines and Quintero are alleged to have been associated together in setting up a terrorist expenditiary force to launch illegal actions against Cuba. The plaintiffs contend that in July 1962 organized crime figures Santo Trafficante, Sam Giancana and John Rosselli joined this group to perform political assassinations in Cuba.

The second criminal venture is alleged to have begun in 1962 and ended in 1975. Shackley is alleged to have been involved in political assassinations and the heroin trade in Laos with Clines working as an associate of Shackley in these operations. In 1966 Singlaub and Secord allegedly joined with Shackley and Clines to establish a political assassination operation based in Laos, Thailand and Cambodia.

The third criminal venture is alleged to have been carried out by Shackley, Singlaub, Clines and Secord in 1966 and 1967. Plaintiffs allege that these defendants set up the Asian Anti–Communist League which cooperated with other groups to establish a political assassination enterprise to operate in South Korea and Taiwan. Plaintiffs allege that this organization became the World Anti–Communist League and is alleged to have engaged in assassinations, illegal export of arms and explosives and other criminal activities throughout the world.

The fourth criminal venture is alleged to have occurred in 1972. The defendants Shackley and Clines are alleged to have participated in the planning of arms shipments and assassinations in Chile.

The fifth criminal venture is alleged to have occurred in 1973. Plaintiffs allege defendant Shackley worked with Clines and Secord to set up the Neugan–Hand Bank in Australia. This bank is alleged to have been the conduit for funds from the Southeast Asian heroin trafficking to terrorist activities including assassinations, gun runnings, and trafficking in explosives.

The sixth criminal venture is alleged to have occurred between 1976 and 1978. Defendants Shackley, Clines, and Quintero are alleged to have worked with others to establish an operation for illegally providing arms and explosives for political assassinations in Iran and Libya.

The seventh venture is alleged to have occurred in 1978 where defendants Secord, Shackley and Clines are alleged to have embezzled money from the United States Department of Defense Foreign Military Sales Program in order to finance terrorist operations and to illegally purchase equipment and aircraft for the Contras.

The eighth criminal venture is alleged to have involved defendants Shackley, Clines, Secord and Hakim in a partnership with one Edwin Wilson. The purpose of this

partnership was to form ETSCO which plaintiffs contend was engaged in both legal and illegal business activities. With the help of the defendant Martin, the illegal activities included financing terrorist organizations.

With these theories established the plaintiffs then sent out their purported violations of § 1962. The plaintiffs allege causes of action under each subsection of § 1962. Each purported violation of § 1962 includes the racketeering activity and the enterprise discussed above.

The plaintiffs first allege that § 1962(a) was violated because the defendants used invested income received from the pattern of racketeering activity described above to establish, acquire an interest in, or operate their collective enterprise to violate the Neutrality Act.

Defendants also allege that the defendant Owen established an enterprise, with income received from the pattern of racketeering described above to establish an Idea, Inc., which was engaged in activities that affect interstate and foreign commerce.

The plaintiffs also allege that the defendants Quintero, Shackley, Secord, Clines and Hakim have used invested income received from the pattern of racketeering activity described above to establish and operate Orca Supply Co. which is engaged in interstate commerce.

The plaintiffs allege that the defendants Delamico and Martin have used invested income received from the pattern of racketeering activity described above to establish and acquire an interest in and operate the Tamiami Gun Shop and a Honduras firm associated with the Tamiami Gun Shop, both of which are engaged in interstate commerce.

This same allegation is made against the defendant McCoy by using income received from the pattern of racketeering activity to establish and operate R & M Equipment.

Plaintiffs make a similar statement against the defendant Hull. They allege that he has used income received from the pattern of racketeering activity to establish and acquire an interest in and operate his citrus farm enterprise.

Plaintiffs use many of these allegations to support their contentions for a finding of violation of § 1962(b). Plaintiffs first contend that the defendant Hull through his racketeering activity alleged above has acquired and maintained an interest in and control of the ALIAMZA REVOLUCIONARIA DEMOCRATICIA ("ARDE").

Plaintiffs also contend the defendants used their pattern of racketeering activity described above to gain control of or operate both Neutrality Act enterprises and the enterprises alleged in the purported violations of § 1962(a).

For the violations of § 1962(c) the plaintiffs allege that each of the defendants was employed or associated with the Neutrality Act Enterprise and has participated in the conduct of the affairs of this enterprise through racketeering acts described above. In addition plaintiffs contend the defendants employed or associated with the other business and enterprise discussed in the purported violations of § 1962(a) and they conducted affairs of these enterprises through a pattern of racketeering activity.

Similar broad allegations are made with respect to violations of § 1962(d). The plaintiffs contend that the defendants have conspired together to violate the subsections in § 1962 and have taken overt acts further into this conspiracy.

### B. The State Law Claims.

Plaintiffs bring seven state law claims. Six arise under Florida common law, and the seventh is one under the Florida RICO Statute, § 895.03. Because the allegations under each of these counts differ, the court now reviews them in detail.

The first count is for battery. The plaintiffs contend that on May 30, 1984, all the defendants acting pursuant to a conspiracy intentionally inflicted serious physical injury upon the plaintiff Avirgan by causing the defendant Galil to place and detonate a C–4 explosive device at the La Penca press conference. Plaintiff further alleges that this intentional battery caused physical injuries in the form of torn flesh, burns and a

mangled left hand to the plaintiff Avirgan. As a result of these injuries the plaintiff contends he incurred hospital costs, medical bills and loss of income due to his inability to work. The plaintiff Avirgan also contends he experienced extreme physical pain and suffering.

The second count is one for loss of consortium on behalf of plaintiff Honey. She alleges that due to the physical injuries inflicted upon Avirgan she suffered loss of consortium including the companionship, fellowship, company and aid of her husband. She also alleges a loss of her income during the period of her husband's recovery.

Plaintiffs also allege a cause of action for assault. Plaintiffs contend the defendants acted pursuant to conspiracy and through agents, and willfully communicated threats of serious physical injury to the plaintiffs. Plaintiffs also allege the defendants had the present ability to effectuate these threats. Plaintiffs contend they were put in fear of their lives, and for the lives of their children, and were forced to move their children from Costa Rica and hire private body guards.

Count four is one for intentional infliction of mental distress and relates to the aforementioned threats in the assault count. The plaintiffs contend that the purpose of these threats was to inflict intentional emotional distress.

The fifth count is one for trespass and damage to personal property. Plaintiffs contend that the bombing at La Penca destroyed the plaintiffs' television recording equipment.

The plaintiffs also allege a state RICO claim under Fla.Stat.Ann. § 895.03. Plaintiffs adopt all their allegations of their federal RICO claim for this claim. They also demand the same relief.

### III. The Law of Summary Judgment

#### A. The Standard to Be Applied.

As Judge Alvin B. Rubin so succinctly stated in *Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir.1986):

The principal function of the motion for summary judgment is to show that, in the absence of factual disputes, one or more of the essential elements of a claim or defense before the court is not in doubt and that, as a result, judgment should be entered on the basis of purely legal considerations. Summary judgment must, therefore, be rendered when the material offered in support of and in opposition to the motion "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" [footnote, citing authorities, omitted].

#### B. Moving Party Who Does Not Have the Burden of Proof.

If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the burden then shifts to the non-moving party to come forward with sufficient evidence to rebut this showing with his own affidavit or other relevant and admissible evidence. Fed.R.Civ.P. 56(e); *Sweet v. Childs*, 507 F.2d 675 (5th Cir.1975), *Munoz v. Intern. Alliance of Thea. Stage Emp.*, 563 F.2d 205 (5th Cir.1977). In *Fontenot* Judge Rubin states it thusly:

In the usual case, the party who seeks a summary judgment must show by affidavit or other evidentiary materials that there is no genuine dispute as to any fact material to resolution of the motion. He must establish thereby the existence or nonexistence of enough of the essential elements of a claim and its related defenses to permit disposition of the claim as a matter of law. Thus, if the movant bears the burden of proof of an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor.

If the movant, however, does not bear the burden of proof, he should be able to obtain summary judgment simply by dis-

proving the existence of any essential element of the opposing party's claim or affirmative defense. "Of course," as Professor Martin B. Louis points out in his article, Federal Summary Judgment Doctrine: A Critical Analysis, "when the movant is a plaintiff he must ordinarily do more than defeat the opposing party's affirmative defenses in order to obtain a final [rather than partial] judgment." Since, in addition to asserting an affirmative defense, the defendant will likely have denied the plaintiff's allegations, the plaintiff must also establish all of the essential elements of his claim.

The crucial question for the court is whether there is a "genuine issue" of fact concerning any essential element of the claim on which judgment is being sought. If the moving party can show that there is no evidence whatever to establish one or more essential elements of a claim on which the opposing party has the burden of proof, trial would be a bootless exercise, fated for an inevitable result but at continued expense for the parties, the preemption of a trial date that might have been used for other litigants waiting impatiently in the judicial queue, and a burden on the court and the taxpayers.

*Fontenot,* 780 F.2d at 1194.

### C. Burden on Non-moving Party Having Burden of Proof.

As Judge Ruben observes in his excellent analysis of the current law of guiding principles to be followed when determining summary judgment issues:

Few of the cases or commentators have squarely faced the problem raised by this case. When a defendant moves for summary judgment of the ground that the plaintiff has failed to establish a prima facie case, must he adduce positive evidence to disprove the existence of an essential element of the plaintiff's case, or may he simply show that the plaintiff has failed to bring out any evidence whatever in support of that element of his claim? The treatises written by Professor Moore and by Wright and Miller at least imply that because of its struc-

ture and phrasing, Rule 56 requires the movant to establish in some fashion the absence of any issue of material fact, even though the other party would be required not only to adduce evidence on, but to prove the existence of, the critical facts at the trial.

Rule 56 does not, however, preclude the coordination of summary judgment proof requirements with the allocation of the burden of proof at trial. If a party who does not have the burden of proof at trial has access to evidentiary materials that disprove the facts necessary to establish the opposing party's position, he should adduce them in one of the fashions mentioned by Rule 56: affidavit, deposition, or testimony, when permitted by Rule 43(e). If, however, it is evident that the party seeking summary judgment against one who bears the proof burden has no access to evidence of disproof, and ample time has been allowed for discovery, he should be permitted as Upjohn did here, to rely upon the complete absence of proof of an essential element of the other party's case. [Footnote, citing authority, omitted].

### D. A Non-moving Party, Opposing a Motion for Summary Judgment Supported by Affidavits Cannot Meet His Burden of Coming Forth with Relevant, Competent Evidence by Relying on Legal Conclusions or Evidence Inadmissible at Trial.

*Fontenot,* 780 F.2d at 1195.

In the case at bar the court must determine whether the moving defendants have produced, by competent admissible evidence, sufficient facts to shift the burden to plaintiffs. If the court reaches this conclusion, it must then consider the plaintiffs' rebuttal proof.

The evidence presented to refute the movants' summary judgment must be supported by admissable evidence showing a genuine issue of material fact. Fed.R.Civ. P. 56(e). The evidence produced by plaintiffs cannot consist of conclusory allegations or legal conclusions. *First National Bank of Arizona v. Cities Serv. Co.,* 391

U.S. 253, 289, 88 S.Ct. 1575, 1529–93, 20 L.Ed.2d 569, 591–93 (1968); *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir.1985); *Fontenot v. Upjohn Co. supra.*

Clearly, only that evidence admissible at trial may be considered in passing on the propriety of the granting or denying of summary judgment. Fed.R.Civ.P. 56(e); *see* also Fed.R.Civ.P. 56(e), advisory committee note *Munoz v. Intern. Alliance of Thea. State Emp.*, 563 F.2d 205 at 213; *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 n. 9 (9th Cir. 1980); *Bruce Construction Corp. v. United States*, 242 F.2d 873 (5th Cir.1957); *Sires v. Luke*, 544 F.Supp. 1155, 1160 (S.D. Ga.1982).

### E. Requirement for Filing of Depositions and Discovery Materials with Court.

S.D.Fla.R. 10 I 1 mandates retention of discovery material by the party taking the deposition or causing the interrogatories or produced items to be taken or obtained. These depositions, interrogatories, requests for documents or admissions, or answers or responses thereto, which are necessary to any pretrial motion, shall, under S.D.Fla.R. 10 I 3, be filed with the Clerk of Court at the time of filing the motion or response thereto if the materials are relied upon by the filing party.

The parties on all sides of this litigation have paid little heed to these rules, although the rule permits "the portions to be used" to be filed with either the motion for summary judgment or the response thereto. The minimal compliance with the rule by the parties has resulted in the court being furnished with only a few pages of some of the depositions, and none of the cross examination by the adverse party. It, therefore, has been a frustrating experience for the court to have been compelled to search the record time and again, in order to collate the portions of testimony furnished by counsel. These portions of deposition testimony were found scattered through the record and not filed as a complete deposition by counsel. The court however, must rely upon the fact that all necessary and relevant deposition and discovery evidence *that the parties deemed important* has been furnished to the court in support and opposition to these several motions for summary judgment filed herein.

### F. Notice to Parties of Final Deadline for Completion of Discovery.

Adhering to the mandate of Fed.R.Civ. P. 1 securing to all litigants in U.S. District Courts the right to "... just, speedy and inexpensive determination of every action.", it is the general practice in this district to set every civil case for pretrial conference shortly after the case is at issue.

Since all discovery must be completed at least five days before the pretrial conference under the provisions of S.D.Fla.R. 14 G, the date ordered by the court for the conference is of critical importance. This date controls the time within which all discovery must be completed. *See* F.R.Civ.P. 16(b). With all discovery completed, the record is complete and the court can rule on any pending motions for summary judgment with all relevant facts in the record.

In this particular case, the court gave eight months notice, by written order, to all counsel of the pretrial conference date.

The parties had clear notice of the discovery cutoff dates in ample time to complete the relevant discovery pertinent to the subject matter. The court made abundantly clear to all parties that there would be no continuation of the discovery phase beyond the time provided by Rule 14 G, both during oral arguments in open court and in written orders issued by the court.

With the foregoing principles in mind the court now turns to the motions for summary judgment filed by the defendants. The court has reviewed all the affidavits submitted by the moving defendants and concludes that under the principles of *Fontenot* the defendants have satisfied their burden of showing the existence of no genuine issue of material fact with respect to the allegations made against them. The burden therefore, has shifted to the plaintiffs to show the existence of genuine issues of

material facts. The court now reviews the proof the plaintiffs have submitted to satisfy their burden.

### IV. *The Plaintiffs Fail to Show a Genuine Issue of Material Fact with Respect to the Causation of Their Injuries*

The court has conducted extensive review of the numerous evidentiary submissions filed by the plaintiffs in opposition to the various summary judgments. The complaint alleges all the defendants to be interrelated, and treats all the defendants as responsible for the bombing for this reason the court has considered all the filings as one. From this viewpoint, the court must grant summary judgment because the plaintiffs have failed to establish the existence of a material fact concerning the cause of their injuries. This is an essential element of a RICO action.[2] The causation link is missing in this record. Without it, the case fails.

Plaintiffs allege that they defendants have injured them in three general ways. First, Plaintiffs allege their business and property were harmed by the bombing at La Penca. Second, the plaintiffs contend that their business and property were harmed by the threats of kidnapping and murder made to their new sources, Carlos Rojas Chinchilla and David as well as the actual kidnapping of Chinchilla and the kidnapping and murder of David. Finally, the plaintiffs allege that the defendants made threats of serious physical harm against them. The court now examines the evidence submitted to show a genuine issue of material fact with respect to the cause of these harms.

The plaintiffs' primary allegation is that the defendant, Amac Galil, disguised as a journalist named Per Anker Hansen detonated the bomb at La Penca press conference acting in conspirital concert with the other defendants. To survive defendants' motions for summary judgment, therefore, the plaintiffs must at least show that genuine issues exist with respect to two allegations: (1) that Hansen did the bombing, and (2) that Hansen was associated with the defendants or was part of the purported enterprise at the time of the bombing.

Plaintiffs have presented no direct evidence, nor eye-witness testimony showing that Hansen was at the press conference, let alone whether he set the bomb. Further, the plaintiffs have not presented any competent evidence to show that Hansen ever had explosives or that this individual was in fact the defendant Amac Galil. Circumstantial evidence has been presented which plaintiffs contend is sufficient to defeat defendants' motions for summary judgment. The court now reviews this evidence.

■ The court starts with the publication submitted by the plaintiffs concerning the La Penca bombing. Exhibit 43 of plaintiffs' opposition to Hull's motion. The publication was written by the plaintiffs and concludes that the journalist Per Anker Hansen, who was the defendant Amac Galil, caused the bombing at La Penca. Obviously, this evidence is patently inadmissible.

■ The plaintiffs have also submitted a report by the Costa Rican authority OIJ. Exhibit 41 of plaintiffs' opposition to Hull's motion. The plaintiffs contend that the OIJ is the equivalent of the Federal Bureau of Investigation. In actuality, the plaintiffs have submitted a one page translation of a five page document originally written in Spanish. This translation concludes that Per Anker Hansen was a Danish national posing as a journalist for a European communications medium. The translation indicates that OIJ further concluded that Hansen carried with him a box whose characteristics corresponded to the debris found at the site of the bombing. The translation of the OIJ report does not conclude that Hansen actually did the bombing. This uncertified, unsigned translation in summa-

---

**2.** Accordingly, the court has no need to, and therefore, cannot make a finding concerning the alleged § 1962 violations.

**1372**

ry form of this purported official document is not admissible.

■ Plaintiffs have also submitted portions of the deposition of Fernandez Cruz Castro. Exhibit 49 of plaintiffs' opposition to Calero's motion. The plaintiffs asked Cruz (who appears to have worked with the OIJ) to either recall or recite the contents of a letter. The testimony submitted does not establish that Cruz had any familiarity with the document. Nevertheless, Cruz states, from memory, that the letter concluded the Per Anker Hansen committed the La Penca bombing. The plaintiffs have not established that this is an official investigative record, and, moreover, have not shown that the requirements of Fed.R. Evid. 803(8)(B) or (C) have been met. The court finds this evidence is unreliable and will not consider it.

Plaintiffs have also filed portions of the deposition of Eden Pastora, the alleged target of the bomb who states that he did not see the journalist known as Amac Galil at the La Penca press conference. Exhibit 3 of plaintiffs' opposition to Hull, p. 75.

The plaintiff, Martha Honey, also filed an affidavit with the opposition papers to Calero's motion wherein she gives a summary of her notes of an interview by telephone of a Mr. Molinares of Molinares Rent a Car. During this conversation Mr. Molinares reviewed his records and told Martha Honey that Per Anker Hansen rented a car from him around March 9, 1984, and kept the car for 14 days. Ms. Honey also states that Mr. Molinares identified Per Anker Hansen as the same person whose picture appeared in the paper. Aside from the obvious evidentiary problems associated with this statement the alleged renting occurred over two months before the bombing at La Penca.

The court next turns to the filed portions of the deposition of Alberto Eduardo Guevara Bonilla (Guevara), Exhibit 14 of plaintiffs' opposition to Hull's motion. Mr. Guevara testified that he saw Per Anker Hansen after the bombing and that "His face was slightly burned, he has soot on his face, there were blood stains on his shirt, and he was in a wheelchair." *Id.* at 10.

Guevara did not see Hansen after that. Guevara also testified that he saw some of the materials collected some 70 meters or so from the bombing site, including a wig worn by Hansen's woman companion. Guevara said the wig found around the explosion site was the same wig that he had seen on Hansen's woman companion because he recognized the peculiarity of the hair style. Guevara had seen Hansen and the woman companion on three separate occasions.

Plaintiffs also offer the Guevara deposition to show that Hansen was in the area around the relative time frame. Guevara testified he saw Hansen and a female companion on the day of the press conference at the Irazu Hotel.

Approximately twenty-two days before the bombing Guevara stated that he saw Hansen, the woman companion and defendant John Hull arriving together in an orange Toyota. Entering a boat with an outboard motor, and heading northeast on the river. He stated that Hansen was carrying a metal case with a "fragile U.S. A. postage" tag on it, along with assorted cameras and camera equipment.

Guevara also testified that he saw Hansen and the woman companion at the end of March or early April 1984. Guevara stated that he was directed by memorandum dated in San Jose to make a vehicle available for Hansen. Hansen and the woman used the vehicle for approximately six hours and returned it to the post.

■ After considering the admissible evidence above the court finds the plaintiffs have made no showing that there is a genuine issue of material fact concerning the bombing at La Penca. At most the evidence could indicate that a genuine issue of fact exists concerning whether Hansen was in the La Penca vicinity around the time of the press conference. Whether Hansen was in the vicinity of the La Penca press conference is not an issue. The allegation of import once here is whether this person Hansen committed the bombing at La Penca. The evidence submitted by the plaintiffs fails to show that there is a genu-

ine issue of material fact with respect to this contention.

Moreover, even if the plaintiffs could show that Hansen did the bombing at La Penca, summary judgment would be appropriate. The plaintiffs have not shown that Hansen was connected to any of the defendants, by proof sufficient to render any of them legally responsible for his actions as required by law. Although they made the allegation, they have not produced competent evidence that Hansen was the defendant Galil as alleged. In addition, the plaintiffs have not otherwise produced evidence that the defendant Hansen was paid by, worked with, associated with, or conspired with any of the other defendants.

Primarily, the plaintiffs attempt to link Hansen with the defendants Hull and Calero. They allege that these defendants had both the motivation and the means to assassinate Eden Pastora. Nonetheless, the fact the Hull and Calero had the motive and means to kill Pastora is not the controlling factual question here. The particular allegation of relevance here the contention that the defendants somehow are connected with Galil, acting as Hansen in the bombing.

Plaintiffs again use portions of the Guevara deposition to show that Hull and Hansen were together when they picked up the boat 22 days before the bombing. Exhibit 14 of plaintiff's opposition to Hull's motion. Eden Pastora testified in his deposition, Exhibit 3 of plaintiffs' opposition to Hull, that he received a radio transmission in the first days of May and was told by his companions that it was Hansen. Pastora deposition at 67–68. Pastora's testimony is patent hearsay without an exception.

Plaintiffs rely upon the statements made by Jack Terrell. Exhibit 27 of plaintiff's opposition to defendant Hull; Exhibit 6 of plaintiffs opposition to defendant Calero. Plaintiffs contend that this is courtroom testimony made by Terrell during the libel trial against the plaintiffs in Costa Rica. No official transcript is provided, but the document reflects that Terrell said that he was personally present at two meetings which took place *after* the La Penca bomb-

ing. Plaintiffs allege that in these meetings a separate conspiracy to assassinate Pastora was discussed.

One meeting was purportedly held in December 1984 or January of 1985 in Calero's home in Miami, Florida. The document containing the purported testimony of Terrell reflected that the following were present: Felipe Videl Santaigo, John Hull, Rob Owens, Tom Posey, Lanney Duyck and one man, unknown to Terrell who was later identified to him (by an unnamed person) as Amac Galil. Terrell stated that in this meeting "Felipe [Vidal] stated that we put a bomb under him and it didn't work because of bad timing. But no one used the name La Penca." Terrell also stated that he knew of no meeting in which John Hull met with the purported La Penca terrorist identified as Amac Galil. Finally, Terrell stated that he had no knowledge that John Hull either participated in the La Penca bombing himself or participated through an intermediary. Exhibit 27 at p. 83–89. Terrell's statement is contained in a publication entitled "La Penca; on Trial in Costa Rica, the CIA v. the Press," edited by Tony Avirgan and Martha Honey, plaintiffs. The testimony contained in plaintiffs' publication cannot be considered as admissible evidence. The court, therefore determines that Terrell's statement contained in plaintiffs' publication is inadmissible.

Plaintiffs also submit the depositions of Joseph Adams and Lanny Duyck who both took the fifth amendment with respect to questions concerning the two meetings mentioned in Terrell's statements. Exhibits 26 and 28 of plaintiff's opposition to Hull. As the court will discuss more in depth shortly, these inferences do not establish any connection between any of the defendants and Hansen.

Plaintiffs argue that when a witness asserts a Fifth Amendment priviledge in response to a question, that the facts stated in the question can be used against not only the witness asserting the privilege, but all other parties. For example, the defendant Quintero asserted the Fifth Amendment to a question concerning the La Penca bombing. Plaintiffs suggest that

a negative inference arises that applies to all defendants.

■ While a negative inference may be applied to other evidence against the person asserting the privilege, *see Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), it cannot be applied to a defendant who did not take the Fifth Amendment.[3] Accordingly, this court will not give a negative inference to any assertion of the Fifth Amendment against any defendant other than the one asserting this privilege.

■ Moreover, the negative inference created against the defendant asserting the self incrimination privilege cannot alone satisfy the burden required by Fed.R.Civ.P. 56. In *United States v. Rylander,* 460 U.S. 752, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983), the Supreme Court held that the negative inference drawn from a defendant's assertion of the Fifth Amendment could not substitute for evidence necessary to meet the burden of production. Plaintiffs only rely on the depositions of the defendants asserting this priviledge as proof of the conspiracy for La Penca. *See* Quintero deposition at pages 82, 97; *See also* depositions of Secord and Hakin. The plaintiffs present no other evidence to show that these defendants actually did the bombing at La Penca, or were associated with Hansen. Accordingly, even if the court agreed with plaintiffs and permitted the drawing of a negative inference to arise from these assertions against these defendants, this would be insufficient to defeat summary judgment.

Plaintiffs also produce some evidence with respect to the defendants' involvement in the transshipment of C–4 explosives. Plaintiffs contend that the explosives used at La Penca were C–4. To support this position, the plaintiffs again rely upon the deposition of Fernando Cruz Castro. Exhibit 49 of Defendant's Opposition to Sin-

glaub. As the court noted before, this deposition, consisting of statements by Mr. Cruz about a letter concerning the bombing at La Penca, is not competent or trustworthy to be admissible under recognized legal standards. Accordingly, this evidence is inadmissible.

Moreover, the other evidence plaintiffs submit concerning C–4 explosives did not specifically relate to the La Penca bombing, either in time or place. They make no showing that this explosive can be directly, or indirectly, traced to the explosive used at La Penca. Plaintiffs attempt to make a showing that these defendants were engaged in the shipment of C–4 explosive to the Central America region. For example, Joseph Adams in his deposition, Exhibit 28 of Plaintiff's Opposition to Hull, took the Fifth Amendment when asked a question whether he had seen C–4 stored in Central America, but answered in the negative when asked whether he had seen C–4 explosives stored in Dade County, Florida during the period of his employment with Adolfo Calero. Apparently, plaintiffs attempt to use Adams' assertion of his Fifth Amendment privilege against Calero to show that C–4 explosives were in Central America. Plaintiffs having failed to make any showing that there were C–4 explosives associated with the enterprise or with the bombing, the court finds that this negative inference does not establish a showing that a material issue of fact exists with respect to the enterprise causing the bombing. Plaintiffs' showing also fails to establish that there was any connection with the C–4 and Hansen, or the C–4 explosive and his relationship to the enterprise.

Plaintiffs also submit evidence concerning the defendants' transshipment of C–4 explosives after the La Penca bombing. For example, they provide passages from the defendant Singlaub's congressional testimony before the Iran Contra Committees of Congress concerning the purchasing of

---

**3.** The law apparently recognizes that a jury may under limited circumstances draw reasonable inferences against an employer from an employee's assertion of the 5th Amendment. *See E.H. Boerth Co. v. LAD Properties,* 82 F.R.D. 635, 645 (D.Minn.1979). Aside from the fact that this type of relationship is not alleged to exist between the defendants here, this court is bound under these circumstances by the Supreme Court's opinion in *Rylander,* 460 U.S. 752, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983).

C–4 explosives through the Iran Contra network in December 1986. *See* Exhibit 43 of plaintiffs' opposition to Singlaub's Motion. In addition, plaintiffs also rely upon the deposition of Sam Hull, Exhibit 10 of Plaintiff's Opposition to Singlaub's Motion, who stated that he requested C–4 for his missions in Central America in the summer of 1985, one year after the La Penca bombing.

Plaintiffs' showing here is insufficient to establish a genuine issue of material fact with respect to whether Hansen was connected with the defendants as part of the purported enterprise at the time of the bombing. The showing may establish issues of fact concerning whether Hansen was in the vicinity of La Penca at the time of the incident, whether Hansen in his alleged role as a newspaperman spoke with one or two of these defendants, and that C–4 explosive was shipped to Central America after the La Penca bombing. Plaintiffs may also have made a showing that a purported conspiracy to kill Eden Pastora arose six months after the La Penca bombing occurred, but they make no showing the Hansen was the defendant Galil or that Hansen or Galil were associated with the enterprise, or worked with the enterprise, or were paid by the enterprise, or any of the defendants.

■ To find the required showing of causation here, the court cannot string these threads together with the submitted evidence concerning some of the defendant's motivations to kill Eden Pastora, *See e.g.,* Statement of Aguado, Exhibit 38 of Plaintiff's Opposition To Hull [4] or evidence of other alleged bad acts, *See e.g.,* Statement of Jesus Garcia, Exhibit 29 of Plaintiff's Opposition To Hull's Motion (speaking in inadmissible manner of attempts to assassinate U.S. Ambassador in Costa Rica). The actual event and motivation, absent any direct evidence of a link, in insufficient to meet the summary judgment burden with respect to the essential element of causation.[5]

Plaintiffs have also alleged that this enterprise participated in other acts of racketeering that caused the plaintiffs injuries after La Penca bombing. The plaintiffs allege that these racketeering acts were designed to thwart the plaintiffs' investigation of defendants' relationship to the La Penca bombing.[6] Plaintiffs also make an

4. This exhibit is an uncertified translation of a statement made by Aguado to a notary public in Costa Rica. The statement says that about a month before the La Penca bombing, Aguado was with Hull and a Mr. Mariano Montealegre at El Higueron in Muelle de San Carlos. The statement continues by saying that a Mr. Juan Jose Saborio Campos (who is not a defendant) joined them. The statement reflects that Aguado did not know, nor had ever seen Campos before that day. The statement indicates that Montrealegre introduced Aguado to Campos, who, without any preamble, stated that "It was necessary to look for a fast way to get rid of Eden Pastora." Aguado stated that he left immediately thereafter, and spoke to Montealegre after Campos left, and Montrealegre stated that Campos "was crazy." Of course, this particular exhibit would be inadmissible at trial and, therefore, cannot be considered on this summary judgment motion.

5. The record also indicates that the plaintiff suffered no cognizable injury under RICO from the La Penca bombing. The plaintiff Avirgan has alleged that a television camera he was using was damaged by the bombing. The defendant Owen notes that the plaintiff Avirgan raised a party in interest question in his deposition. At pages 343–344 of his deposition, Avirgan indicated that the damage to the camera was paid by a Lloyd's of London insurance policy and ABC News, Avirgan's employer. Under the principles of equitable subrogation, which Florida recognizes, *see Dixie National Bank of Dade County v. Employers Commercial Union Ins. Co.,* 463 So.2d 1147 (Fla.1985), the entity compensating for another's loss has the right to recover from the entity causing the loss. Apparently, under this analysis, the only parties who could recover for the camera's damage would be Lloyd's of London and ABC, News. If this proposition were true, Avirgan would have no La Penca injury capable of being remedied by RICO. His only allegations remaining regarding La Penca would be the loss of income due to physical injuries allegedly inflicted by the bombing. In this circuit, recovery for these injuries under RICO is prohibited. *See, Grogan v. Platt,* 835 F.2d 844 (11th Cir. 1988).

6. The court finds that the plaintiffs cannot suffer any injury to their news business or any property right by the alleged threats, kidnapping and murder of their news sources. The plaintiffs cannot have a property right in these individuals. The plaintiffs' expectation that these news sources would continue giving them infor-

insufficient showing to withstand summary judgment with respect to these allegations.

Plaintiffs first allege that they were injured in their business and property by the defendants' threats to kidnap and murder two of their news sources—a Carlos Rojas Chinchilla and David. Moreover plaintiffs allege that their business and property were further injured when David was murdered and Chinchilla kidnapped.

██ To support these allegations plaintiffs offer the deposition testimony of Carlos Rojas Chinchilla (Rojas), Exhibit 49 of Plaintiff's Opposition to Hull and as Exhibit to Plaintiff's Opposition to Calero. Rojas testified that David, a Contra giving inside information to plaintiffs, and himself, were kidnapped and driven for several hours to a field. Mr. Rojas never identified the field or the men who had kidnapped him, but he stated that the unknown men said they were going to call John Hull's house, or where ever John Hull was. Rojas Deposition at 190. Rojas testified that he and David struck the man with the gun and ran away to safety. The court finds that the testimony of Carlos Rojas repeating comments of one of his kidnappers is inadmissible hearsay.

██ Martha Honey also testified "We also now have been told by Costa Rican and Contra sources, officials, that David, our witness was killed on John Hull's farm." Deposition of Martha Honey, Exhibit 45 of Plaintiff's Opposition To Hull. Because Martha Honey's testimony is hearsay evidence the court finds it inadmissible.

Accordingly, because this testimony does not establish any connection between the defendants and these alleged acts, the plaintiffs have failed to make the requisite showing that a genuine issue of material fact exists with respect to these allegations.

The court now turns to the allegations concerning the threats of physical harm to the plaintiffs. Martha Honey testified that she received death threats over the telephone around the time that David disappeared. See Exhibit 45 of Plaintiff's Opposition to Hull. Ms. Honey never provided any information connecting the threats she received to any member of the enterprise. Plaintiffs also offer the testimony of Carmen Araya. Exhibit 46 of Plaintiff's Opposition to Hull. Ms. Araya, an employee of the plaintiffs, received a death threat from an unknown person while she was having ice cream at a shop. She testified that someone came up to her and asked if she worked for Martha and Tony and said to be careful because "I work for John Hull and just be careful." Araya deposition at 21–22. Again no showing was made as to whom the person was who made the threat to her or for whom the person worked for except for the hearsay testimony that the threatener worked for John Hull.

Finally, plaintiffs also seek to use the deposition testimony of Glen Robinette. Exhibit 41 of Plaintiff's Opposition to Secord. Robinette testified that he was hired by defendant Secord to investigate the plaintiffs with respect to this law suit. Robinette testified that he met with Hull and received several affidavits which he stated indicated that Avrigan and Honey approached persons presently in jail to provide false testimony. The affidavits were never filed and the testimony of Robinette does not show that any of the defendants were attempting to interfere with plaintiffs' news gathering business. Accordingly, plaintiffs have failed to make the requisite showing that a genuine issue of material fact exists with respect to interference with their business or that threats of physical harm were made to them.

mation is not an entitlement, but only a speculative proposition.

The Plaintiffs' previous reliance on *Carpenter v. United States,* —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), is inapposite here. The *Carpenter* court found a newspaper's use of information already within its control to be a protected property right. The newspaper had

"possession" of this information because the sources had given one of the newspaper's reporters some relevant facts that the reporter turned into a news article. These facts are not alleged by the plaintiffs. The analysis that follows is given only for the purpose of indicating that the plaintiffs have failed to make a sufficient showing with respect to these allegations.

The plaintiffs have not made a showing of a genuine issue of material fact with respect to any of their allegations concerning the cause of their purported injuries. Causation is an essential element of a RICO action. Accordingly, the defendants who have moved are entitled to summary judgment.

### V. Summary Judgment On The State Law Claims

Because the plaintiffs have failed to show that a genuine issue exists with respect to the causation of their injuries, the defendants are entitled to summary judgment on the state law claims as well. Summary judgment is proper on the Florida RICO claim because summary judgment is granted on the Federal RICO claim, which the State claim mirrors. The battery, trespass, and the loss of consortium counts all revolve around the alleged bombing at La Penca. Because the plaintiffs have made no showing that a genuine issue of material fact exists with respect to the defendants causing this bombing, plaintiffs are not entitled to present these claims to the jury. Similarily, because the assault and mental distress claims revolve around the alleged threats made to the plaintiffs, and the plaintiffs have made no showing of a genuine issue of material fact with respect to the threats, defendants are entitled to summary judgment on these counts.

### VI. Conclusion

As set forth above, the plaintiffs have made no showing of existence of genuine issues of material fact with respect to either the bombing at La Penca, the threats made to their news sources, or threats made to themselves. Plaintiffs, therefore, cannot show that their injuries were proximately caused by the defendants. Both RICO causation and tort law causation must be proven in every case. The defendants are, therefore, entitled to summary judgment.

With respect to the non-moving defendants, the Court cannot try them in the interests of fairness and judicial economy. The plaintiffs have been on notice that these defendants would be subject to dismissal by the challenges made in the other defendant's motions. These challenges went to the heart of the plaintiff's theory, which now cannot be submitted to the jury. To try these defendants would be unfair to them, and as Judge Rubin stated, unfair to the other litigants "waiting impatiently in the judicial queue". *Fontenot,* 780 F.2d at 1194. Accordingly, all the defendants are entitled to summary judgments. It, therefore, is

ORDERED and ADJUDGED summary judgment is hereby entered for and on behalf of each of the defendants in this case.