**In re MANAGED CARE LITIGATION.**

**This Document Relates to Subscriber Track Cases.**

No. MDL 1334.
No. 00–1334–MD.

United States District Court,
S.D. Florida,
Miami Division.

June 12, 2001.

As Amended June 20, 2001.

**1334**

### ORDER OF PARTIAL DISMISSAL WITHOUT PREJUDICE

MORENO, District Judge.

Plaintiffs are patients suing managed care insurance companies ("MCOs") for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), aiding and abetting a scheme to violate RICO, the Employee Retirement Income Security Act ("ERISA"), and common law conspiracy. With the exception of *Price v. Humana*, the Court dismisses, without prejudice, the RICO claims because the Plaintiffs, at this time, have not properly pled the predicate acts of mail and wire fraud with particularity. The Court denies Defendant Humana's motion to dismiss the RICO claims brought by Plaintiffs Price, Sessa, Katz and Yingling, as they have established *primae facie* RICO claims as discussed below. The Court also dismisses, without prejudice, all of the Plaintiffs' ERISA claims due to a failure to comply with that statute's exhaustion requirement.

### BACKGROUND

This Order addresses motions to dismiss seven separate putative class action lawsuits. One case, *Price v. Humana*, was originally filed in this Court. The six other lawsuits were previously filed in the federal district court for the South District of Mississippi against the following Defendant insurance companies: Aetna, CIGNA,

Foundation Health,[1] Pacificare, Prudential and United.[2] Each of these lawsuits was transferred to this Court by the Judicial Panel on Multidistrict Litigation ("MDL Panel") and consolidated with the *Humana* case, pursuant to 28 U.S.C. § 1407.

The Plaintiffs proffer the following facts detailing the alleged scheme perpetrated by the Defendants.[3] These MCO allegedly targeted the representative Plaintiffs and induced them to enroll in the MCOs' plans by virtue of standardized misrepresentations and factual omissions contained in advertising, marketing and membership materials. Those advertisements and materials state that the subscriber's Primary Care Physician will prescribe treatments on the basis of the physician's independent medical judgment, exercised with reference to each subscriber's "medical needs." O'Neil Complaint, ¶ 47. Unsuspecting patients are allegedly led to believe that their confidential relationship with their personal physician will not be inhibited by influence from their MCO. *Id.* at ¶ 104. However, the Plaintiffs charge that they were not fully informed about certain unspecified monetary incentives used to influence their doctors. For example, the managed care company states in its plan benefits materials that the incentives are "intended to continually improve medical care" and "enhance patient satisfaction." *Id.* at ¶ 102. The Plaintiffs argue that those financial incentives methodically erode the doctors' independent judgments because they reward doctors who limit medical expenses according to factors which override a patient's best interest in favor of restraining "unnecessary" treatment. *Id.* at ¶ 59.

---

1. Subsequent to the commencement of the action against Defendant Foundation, the Defendant changed its name to Health Net, Inc.

2. These cases are: *O'Neil v. Aetna, Inc.; Williamson v. Prudential Ins. Co. of America; Pickney v. CIGNA Corp., Hitsman v. PacifiCare*

*Health Systems, Inc.; Romero v. Foundation Health Systems, Inc.;* and *McRaney v. United HealthCare Corp.*

3. For ease of administration, unless otherwise indicated references to the Plaintiffs' complaints will be taken from *O'Neil v. Aetna.*

In addition, the Plaintiffs allege that the managed care insurance companies manipulate the words "medical necessity." *Id.* at ¶ 77. At the time the subscriber is induced to enroll in the plan, he believes that the words "medical necessity" means that which is necessary to meet the patient's medical needs in the view of the patient's doctor and the American Medical Association. *Id.* at ¶ 59. In fact, the Plaintiffs say, the MCO's perverse definition of medical necessity more closely resembles whatever will not unnecessarily lower the MCO's profits when delivering medical care.

The Plaintiffs allege that, in making medical necessity determinations, every Defendant managed care company relies primarily not on the studied judgment of experienced physicians, but rather on undisclosed and unregulated guidelines created by third parties who make their calculated decisions based upon "the minimum possible level of care that was adequate in a limited sample of 'best case' situations." *Id.* at ¶ 66. The Plaintiffs assert that "[s]trong financial concerns drive virtually every decision" made by distant MCO medical review bureaucrats with no medical training or education, who base their determinations on little information and no in-person contact with the patient. *Id.* at ¶¶ 66, 77 (quoting Peeno Testimony). Such is not the quality of medical coverage for which the subscribers bargained.

According to the Plaintiffs, the doctors are also victims of the Defendants' quest for profits at the expense of patients. The Plaintiffs allege that each managed care company applies extortionate financial pressure on the physicians in order to keep patients in the dark about the financial incentives and the medical necessity bait-and-switch, yet tell potential plan members that it "encourages participating physicians to discuss their financial arrangements with patients." O'Neil Complaint, ¶ 99. The acts of extortion therefore further the nationwide conspiracy to defraud patients of proper treatment and appropriate insurance coverage as promised. *Id.* at ¶¶ 168–69. The MCOs require "gag clauses" in their contracts with physicians, whereby the doctors suffer penalties if they communicate to the patients information concerning the financial incentives or discuss alternative treatment not covered by the managed care company's plan. *Id.* at ¶¶ 59, 79 (citing Patient Right to Know, Re: H.R.2976, the "Patient Right to Know Act of 1996," Hearings Before the House Subcomm. on Health, Comm. on Ways and Means, 104th Cong. (1996) (testimony of John C. Nelson, M.D., presenting statement of the American Medical Association) (" 'Gag clauses' strike at the heart of the patient-physician relationship because they present an inherent ethical conflict of interest.")). The Plaintiffs maintain that, by hiding behind the high respect and trust that individuals place in their doctors, the Defendants are able to take advantage of the special relationship between patient and doctor in order to increase profits and wrestle away from patients medical treatment purchased through the payment of premiums.

## STANDARD OF REVIEW

A court should grant a motion to dismiss only if the plaintiff fails to allege any facts that would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on such a motion, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *St. Joseph's Hospital, Inc. v. Hospital Corp. of America,* 795 F.2d 948 (11th Cir.1986).

## PERSONAL JURISDICTION

Defendant Foundation contends that this Court does not have personal jurisdic-

tion over it. Unless a decision on the merits would favor the party challenging jurisdiction, courts should address issues relating to personal jurisdiction before reaching the merits of a plaintiff's claims. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 940–41 (11th Cir.1997). Foundation argues that because *Pay v. Foundation Health Systems, Inc.* was transferred to this Court from the Southern District of Mississippi for pre-trial proceedings only, the Court should apply the test for personal jurisdiction as if that case were still pending in Mississippi.[4] Accordingly, the Defendant argues that the case should be dismissed for lack of contacts with Mississippi, despite any minimum contacts with Florida, where this Court sits.

Yet in cases transferred pursuant to Section 1407, a federal district court applies the clearly settled law of the transferee court. *See Murphy v. Federal Deposit Ins. Corp.*, 208 F.3d 959, 965 (11th Cir. 2000), *cert. denied*, 531 U.S. 1049, 121 S.Ct. 849, 148 L.Ed.2d 733 (2001) (adjudicating choice of law in the context of a transfer under 28 U.S.C. § 1406); *In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171 (D.C.Cir.1987). Moreover, irrespective of any alleged insufficient contacts with Mississippi, RICO's nationwide service of process provision, 18 U.S.C. § 1965(d), provides that process may be served "on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Given the Plaintiffs' assertion of a colorable RICO claim and the Defendant's status as a domestic corporation doing business in this country, the statutory basis for personal jurisdiction is satisfied. *BCCI Holdings*, 119 F.3d at 942.

The only remaining issue is whether an exercise of jurisdiction over the Defendant comports with the Fifth Amendment's guarantee of due process. This requires an inquiry into (1) whether the defendant has established that its liberty interests have actually been infringed, and if so, (2) whether the burdens imposed on the individual defendant outweigh the federal interest. *Id.* at 949. Under the first prong, the Defendant must shoulder the burden of showing "that the assertion of jurisdiction in the forum will make litigation so gravely difficult and inconvenient that [the Defendant] unfairly is at a severe disadvantage in comparison to his opponent." *Id.* at 948 (citations and quotation marks omitted). Foundation has proffered no evidence that its ability to defend this lawsuit will be compromised if it is eventually required to litigate in Mississippi. Because the Defendant failed to meet its burden of showing that its liberty interests have been infringed, the Court "need not balance the federal interests at stake in this lawsuit." *Id.* The Court therefore concludes that it may properly exercise jurisdiction over the Defendant.[5]

4. This Court's October 23, 2000 order granted Plaintiff Kerrie Pay leave to withdraw from the case and accepted the substitution of the two present Plaintiffs, Linda Romero and Rafael Valdes.

5. Defendants Aetna, CIGNA and Prudential argue that each "First Amended Complaint" filed in the Southern District of Florida by the Plaintiffs does not properly amend any complaint pending in this court, violates the "first-filed rule" and must be dismissed for these reasons. Apparently each Plaintiff filed a complaint directly with this Court in anticipation of that case being transferred from the South District of Mississippi to this Court by the MDL Panel. In the interest of judicial efficiency the Court will treat these First Amended Complaints (and the Second Amended Complaint filed against Foundation) as reiterating the substance of the transferred cases. Likewise, Defendant United's arguments concerning personal jurisdiction and venue are moot in light of the MDL Panel's transfer of *McRaney v. United Heathcare Corp.*

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

Section 1962(c) of Title 18 of the United States Code states that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." "Racketeering activity" consists of any enumerated federal and state crime listed in Section 1961(1) of the statute, and here the Plaintiffs allege that the Defendants have committed extortion, mail fraud and wire fraud. A " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years (excluding any term of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

RICO establishes both criminal and civil penalties for violations of Section 1962. 18 U.S.C. §§ 1963, 1964. Section 1964(c) provides a private cause of action in federal district court for "any person injured in his business or property by reason of a violation of section 1962." The injured party may recover treble damages, as well as costs. The Defendants each are alleged to be indictable under the following statutory provisions, the violations of which purportedly form a pattern of racketeering activity: 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1346 (scheme or artifice to defraud), 1951 (extortion) and 1952 (Travel Act).

## STANDING

A "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation" of RICO. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The Defendants contend that the Plaintiffs lack standing to bring their RICO claims because the Plaintiffs' allegations that they have been injured by paying more for insurance coverage than they would have, absent Defendants' felonious nondisclosures and misrepresentations, is an injury too speculative in fact and unfounded in theory to confer standing. The Third Circuit decision *Maio v. Aetna, Inc.,* 221 F.3d 472 (3d Cir.2000), stands at the center of the Defendants' arguments.

The plaintiff subscribers in *Maio* brought a RICO civil action based upon the theory that their health maintenance organization ("HMO") insurance company committed predicate acts of mail and wire fraud when it failed to disclose certain internal policies which contradicted the message conveyed to the subscribers, and therefore the plaintiffs received an inferior insurance product. The Third Circuit panel affirmed the dismissal of the lawsuit on standing grounds, observing that unless the plaintiffs claimed that the HMO denied benefits or delivered inadequate treatment, they could not maintain the "conclusory allegation that they have been injured in their 'property' because the health insurance they actually received was inferior and therefore 'worth less' than what they paid for it." *Id.* at 488.

The Plaintiffs in their pleadings attempted without success to distinguish *Maio* on its facts. However, this acknowl-

---

and this Court's decision deeming that transferred case, rather than the complaint filed in the Southern District of Florida, to be the authoritative one for purposes of this MDL proceeding.

edges the merit of the argument by Plaintiffs' counsel during oral argument that the reasoning in *Maio,* rather than be distinguished, should simply not be adopted.

The *Maio* court drew a dichotomy between property interests and contracts and concluded that the subscriber plaintiffs in that case possessed only contractual rights rather than a property interest in their insurance coverage. *See Maio,* 221 F.3d at 488 (An "HMO is not a tangible property interest, like a plot of land or a diamond necklace."). But the proposition that insurance is a contractual promise to assume a risk is not seriously in dispute. *See Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211 n. 7, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (citing Webster's New International Dictionary of the English Language 1289 (unabr.2d ed.1958) (defining insurance as "a contract whereby, for a stipulated consideration, called a premium, one party undertakes to indemnify or guarantee another against loss by a certain specified contingency or peril, called a risk, the contract being set forth in a document called the policy....")). Yet it is apparent that the Plaintiffs do not allege that the Defendants breached their contracts.

■ The proper dichotomy in this case is breach of contract versus claims sounding in tort. The mail and wire fraud predicate acts which form the basis of the injurious racketeering activity are similar to the tort of fraudulent inducement, a cause of action which may be brought independent of a contract claim. *See, e.g., HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So.2d 1238, 1239 (Fla.1996) ("Fraudulent inducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract."). Plaintiffs contend that they were fraudulently induced to subscribe to managed care coverage that had a market value less than what Plaintiffs bargained

for, namely, a policy which would not be subject to Defendants' undisclosed fiscal policies. These policies include allegedly paying financial incentives to doctors to limit costs while plaintiffs were led to believe that their physicians would be exercising independent medical judgment, employing a definition of "medical necessity" during the claim review process which is heavily subject to fiscal considerations in contrast to the misleading definition provided to the Plaintiffs, and executing heavy-handed tactics against physicians in a manner which interferes with the honest delivery of healthcare services.

In sum, the *Maio* court took an overly restrictive view of property rights and overlooked the distinction between business-related torts and contract breaches. Section 1964(c), which accords relief to "[a]ny person injured in his business or property by reason of a violation of section 1962," is not so confined. As the Supreme Court has observed, money is a form of property. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 338, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Furthermore, "[a] person whose property is diminished by a payment of money wrongfully induced is injured in his property." *Id.* at 340, 99 S.Ct. 2326; *see Bennett v. Berg,* 685 F.2d 1053, 1058 (8th Cir.1982) (finding standing to bring a RICO claim where the alleged injury was "not so much that the contractual terms have been breached, but that the value of the contracts is different than appellants were led to expect through extracontractual statements and promises."); *cf. Maio,* 221 F.3d at 489 n. 14 (recognizing disagreement with *Bennett* ). *See also In re Merrill Lynch Limited Partnerships Litigation,* 154 F.3d 56, 59 (2d Cir.1998) (ruling that the plaintiff investors sustained a ripe injury with recoverable out-of-pocket losses when they invested given that the partnerships were fraudulent at the outset and would never achieve the

promised objectives); *Butala v. Agashiwala*, 916 F.Supp. 314 (S.D.N.Y.1996) ("In the case of the purchase of allegedly fraudulent limited partnerships, ordinarily the injury occurs at the time of purchase.").

The Defendants also cite *Atlanta Gas Light Co. v. Aetna Casualty and Surety Co.*, 68 F.3d 409 (11th Cir.1995), in support of their argument that the Plaintiffs' claims are too speculative given that federal judicial power under Article III, Section 2 of the United States Constitution extends only to concrete "cases or controversies." *Id.* at 414. The plaintiff gas company in that case, anticipating that adverse environmental regulatory activity might be brought against it, filed a declaratory judgment action under 28 U.S.C. § 2201 seeking judicial determination of its contractual rights to indemnification by insurance companies. The court dismissed the plaintiff's claim, finding that no case or controversy existed because the defendants' contractual duties and the plaintiff's obligation to give notice could not be determined when it was unclear what actions would be required by the regulators or whether any enforcement action would ever be taken against the plaintiff. *Id.* at 415. The Defendants' reliance on *Atlanta Gas* is misplaced. The Plaintiffs in this case allege that they were fraudulently induced to purchase insurance coverage with explicit rights to coverage which the Defendants never intended to honor, and therefore suffered a tortuous injury at the time they enrolled in the Defendants' plans. *Atlanta Gas* by contrast concerned solely a clarification of the defendants' future performance obligations under valid contractual agreements.

The Plaintiffs have alleged facts sufficient to maintain standing to bring these claims. The Court will revisit these issues at the summary judgment stage, or earlier if appropriate, and consider whether the evidence supports the allegations of injury.

This inquiry might, for example, explore whether feasible alternatives to each managed care insurance company existed for the Plaintiffs and whether the concept of "overpayment" is an objective standard which can be verified by reference to a market for MCO services.

Finally, only *Price v. Humana* specifically alleges that the injury from the acts of wire and mail fraud arises from overpayment for a particular amount of insurance coverage. The other complaints allege sufficient facts for the Court to deduce the overpayment theory from the Plaintiffs' allegations. However, unless the remaining Plaintiffs re-plead additional theories of injury at the next opportunity, they will be limited to the overpayment theory of injury as stated in the *Humana* complaint.

## THE MCCARRAN–FERGUSON ACT

■ The Defendants contend that the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), bars the Plaintiffs' RICO claims. That statute was passed by Congress in 1945 in order to make it clear that the states generally retained the power to regulate the business of insurance. Specifically, the Act states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). The Defendants identify statutes from California, Florida, Oklahoma and Texas which permit certain cost-containment processes by insurance companies, regulate these practices and provide administrative review procedures. *See, e.g.,* Cal. Health & Safety Code §§ 1340 *et seq.* (Knox–Keene Health Care Service Plan Act of 1975); Tex.Ins.Code Ann. art. 21.58A(4).

The Defendants express apprehension over the possible effects that the Plaintiffs' RICO claims could have on state-level policy which ratifies cost-containment processes. Specifically, the Defendants charge that this federal civil action would interfere with carefully crafted regulations implemented by the states in violation of the McCarran–Ferguson Act and the Supreme Court's ruling in *Humana, Inc. v. Forsyth*, 525 U.S. 299, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999).[6] But the *Humana* Court held that the McCarran–Ferguson Act generally does not bar private civil RICO suits. *Id.* at 314, 119 S.Ct. 710. RICO and the Nevada state insurance laws at issue in that case could be applied in harmony, and RICO did not frustrate any state policy regarding the insurance laws. In the present case, with the possible exception of California, it is clear that permitting these private civil RICO suits would aid and enhance the state regulation of the insurance industry. *Id. See, e.g.,* Tex.Ins.Code 20A.14(a) ("No health maintenance organization, or representatives thereof, may cause or knowingly permit the use of advertising which is untrue or misleading, solicitation which is untrue or misleading, or any form of evidence of coverage which is deceptive.").

■ Defendant Prudential's arguments with respect to the potential impact of Plaintiff Williamson's lawsuit on the administration of California state law require a closer analysis. The Supreme Court in *Humana* observed that the existence of a state-sanctioned private right of action is a key factor for determining whether a RICO lawsuit would "impair" state law in contravention of the McCarran–Ferguson Act. 525 U.S. at 312, 119 S.Ct. 710. The

absence of a state-level cause of action counsels in favor of barring the federal lawsuit. *See LaBarre v. Credit Acceptance Corp.,* 175 F.3d 640, 643 (8th Cir. 1999) (holding that the McCarran–Ferguson Act barred a RICO suit where no analogous private cause of action existed under Minnesota law).

Plaintiff Williamson contends that a private cause of action exists under California's Knox–Keene Act to remedy the alleged fraud and extortion which form the basis of Williamson's RICO action against Prudential. However, *Samura v. Kaiser Foundation Health Plan, Inc.,* 17 Cal. App.4th 1284, 22 Cal.Rptr.2d 20 (1993), *cert. denied,* 511 U.S. 1084, 114 S.Ct. 1835, 128 L.Ed.2d 463 (1994), the only California appellate decision squarely on point, paints a different picture. First, the *Samura* court observed that no private cause of action brought by a health care plan beneficiary may be maintained directly under the Knox–Keene Act itself, because enforcement of that Act "has been entrusted exclusively to the Department of Corporations, preempting even the common law powers of the Attorney General." *Id.* at 29. However, Business and Professions Code § 17203, known as the "unfair competition law," provides a cause of action to remedy any "unlawful, unfair or fraudulent business practice," including acts which are made unlawful by the Knox–Keene Act. *Samura,* 22 Cal.Rptr.2d at 29. Yet, although the Knox–Keene Act contains provisions relevant to Plaintiff Williamson's legal action, such as Health & Safety Code § 1363 (regulating the content of the disclosure form provided to prospective members), the *Samura* court found that these sections were still beyond the grasp

---

**6.** In *Humana,* policyholders under a preferred provider organization contract with the health insurance company alleged that Humana and a hospital engaged in an elaborate kickback scheme to defraud them. The allegations included the charge that Humana secretly obtained discounts from the hospital and yet concealed those discounts from the policyholders.

of private plaintiffs. *Id.* at 31 ("[T]he courts cannot assume general regulatory powers over health maintenance organizations through the guise of enforcing Business and Professions Code section 17200.").

The *Samura* court concluded that the only avenue open to prospective plaintiffs was section 1360(a), which broadly prohibits deceptive practices in advertising or soliciting enrollment in a health care plan. But the utility of this option is constrained by the court's holding that the statute does not apply to documents that are not actually used in the advertisement or solicitation. *Id.* at 30. Furthermore, even when a lawsuit can be maintained under the unfair competition law, a plaintiff is usually limited to injunctive relief and restitution. *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527, 539 (1999). Therefore, to the extent that Plaintiff Williamson relies on the unfair competition law to support his contention that an analogous cause of action exists under California state law, he cannot enjoy the treble damages authorized by RICO. *Humana,* 525 U.S. at 313 & n. 11, 119 S.Ct. 710 (holding that the RICO private right of action and its attendant treble damages did not impair the Nevada insurance law because state law provided for greater damages than those available under RICO).

California case law and the parties' briefs thus far lead to the conclusion that Plaintiff Williamson's RICO claims should be curtailed.[7] The Plaintiff will have the opportunity to re-plead his RICO claims to conform with the McCarran–Ferguson Act

and may also amend his complaint to add new representative plaintiffs who are not covered by California law. Aside from Prudential, the Defendants have not shown that permitting the Plaintiffs to remedy alleged acts of fraud, extortion and conspiracy in federal court will significantly impair, rather than advance, the interests of state insurance laws or that this action will disrupt a state administrative system. If the Plaintiffs prevail on the merits of their claims, the Court will revisit this issue in the context of assessing appropriate relief.

## ENTERPRISE

Under Section 1962(c), one may not "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The Plaintiffs allege that each Defendant participated in a separate enterprise which consists of the Defendant insurance company and the following entities with which the Defendant associates: "primary physicians, medical specialists, medical laboratories, hospitals, healthcare clinics, pharmacies, home healthcare agencies, Non–MCO co-conspirators, and other miscellaneous healthcare providers, all of which serve the purpose of providing healthcare services to enrollees in [the MCO's] Health Plans." The Defendants argue that the Plaintiffs' complaints do not adequately describe the existence of a RICO enterprise as required by Section 1962(c).

The term " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or

---

7. However, after the parties filed their briefs concerning this matter, the California legislature, through a new law effective January 1, 2001, acknowledged a willingness to increase the liability of health maintenance organizations by giving patients a limited right to sue their HMO. *See* Cal.Civ.Code § 3428. Fur-

thermore, as of July 1, 2000, much of the regulatory enforcement power previous wielded by the Department of Corporations now resides with the newly-created Department of Managed Health Care. *See* Cal. Health & Safety Code § 1341.

group of individuals associated in fact although not a legal entity." § 1861(4). An association-in-fact enterprise requires that the plaintiff identify a group of persons who are associated together for a "common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). This "association of individual entities, however loose or informal, ... furnishes a vehicle for the commission of two or more predicate crimes" which comprise the racketeering activity. *United States v. Goldin Indus.*, 219 F.3d 1271, 1275 (11th Cir.2000) ("*Goldin II*"), *cert. denied*, 531 U.S. 1015, 121 S.Ct. 573, 148 L.Ed.2d 491 (2000). The existence of an enterprise may be proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. Finally, the "operation or management test" requires that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993); *U.S. v. Castro*, 89 F.3d 1443, 1452 (11th Cir.1996).

The Defendants argue that the Plaintiffs have not properly shown that the members of the enterprise have a common purpose, noting that the complaints charge that the physician enterprise members are victims of the Defendants' extortionate activity. But the supposed conflict between these parties does not refute the Plaintiffs' position that all members of the enterprise "serve the purpose of providing healthcare services to enrollees in Aetna's Health Plans." O'Neil Complaint, ¶ 152; *see also* Plaintiffs' Opposition to Defendant Aetna's Motion to Dismiss the First Amended Complaint at 23 (stating that the members of the enterprise have the overriding common purpose of "providing medical treat-

ment under the strictures of [the MCO's] cost- and treatment-suppression regime, while representing the regime to provide for treatment decisions based on medical necessity and the independent medical judgment of subscribers' physicians.").

Defendants CIGNA, Humana and Prudential next argue that, in contravention of *United States v. Goldin Indus.*, 219 F.3d 1268 (11th Cir.2000) (en banc) ("*Goldin I*") and *Goldin II*, the Section 1962(c) enterprise is not distinct from the person alleged to have engaged in racketeering activity. These Defendants read the *Goldin Industries* opinions far too broadly. That case brought the Eleventh Circuit in line with the now-universal view among the circuits that a Section 1962(c) enterprise cannot be comprised of a corporation and its employees or subsidiaries. *Goldin I* at 1270–71. The instant complaints state that the enterprise includes many individuals who are not employed by the MCOs and entities who are not owned by the MCOs. If it is these Defendants' contention that the enterprise consists of defacto employees, such a fact-based argument exceeds the scope of a motion to dismiss. The Plaintiffs have satisfied the *Goldin Industries* distinct person requirement for a Section 1962(c) enterprise.

However, while closer to the mark than the Provider Track Plaintiffs' original attempts to formulate an enterprise, "one cannot easily identify who comes within the ambit of these enterprises, or where they begin and end." *In re Managed Care Litigation*, 135 F.Supp.2d 1253, 1262 (S.D.Fla.2001) ("Provider Track Order"). This observation particularly applies to the inclusion of the impermissibly ambiguous addition of "[n]on-MCO co-conspirators, and other miscellaneous healthcare providers." Because these vaguely identified components are not crucial to the existence of the enterprise, the Court, for the time

being, excludes them from the defined enterprise. The Plaintiffs are given leave to file an amended complaint which, if they so choose, will adequately plead these additional enterprise members no later than June 29, 2001.[8]

## PREDICATE ACTS

### A. Mail and Wire Fraud

■ Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme. *United States v. Downs*, 870 F.2d 613, 615 (11th Cir. 1989). A "scheme to defraud" entails the making of misrepresentations intended and reasonably calculated to deceive persons of ordinary prudence and comprehension. *Pelletier v. Zweifel*, 921 F.2d 1465, 1498–99 (11th Cir.1991).[9]

The Defendants assert that the Plaintiffs' use of wire and mail fraud as a predicate act is foreclosed by the "filed rate doctrine," which "recognizes that where a legislature has established a scheme for utility rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme." *Taffet v. Southern Co.*, 967 F.2d 1483, 1490 (11th Cir.1992). A consumer is barred from challenging the reasonableness of a rate because the consumer has no legal right to pay any rate other than that set by the administrative agency. *Id.* at 1494. Florida, Indiana, Mississippi and Texas require that health insurance companies file information concerning their rates with the respective regulatory bodies, and those rates are subject to rejection or approval. *See* Fla.Stat. § 641.21(1)(f) (requiring that a form be filed with the Florida Department of Insurance stating what rates are charged and certifying that "the rates are neither inadequate nor excessive nor unfairly discriminatory"); Ind.Code Ann. § 27–13–2–5(9)(B) (mandating that an application for a certificate of authority to operate a health maintenance organization state the "methodology for determining premium rates to be charged"); Miss.Code § 83–41–331(1), (2) ("No premium rate may be used until either a schedule of premium rates or methodology for determining premium rates has been filed with and approved by the commissioner.... [T]he premium rates shall not be excessive, inadequate or unfairly discriminatory."); Tex.Ins.Art. 20A.09(k) ("The formula or method for calculating the schedule of charges for enrollee coverage for medical services or health care services must be filed with the commissioner before it is used in conjunction with any health care

---

8. The Defendants in the Subscriber Track litigation have relied upon *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673 (7th Cir. 2000), for the proposition that the Plaintiffs' enterprise lacks an adequate structure. However, the Provider Defendants' April 30, 2001 Memorandum in Support of Joint Motion to Dismiss Provider Plaintiffs' Consolidated Amended Class Action Complaint discusses, for the first time, additional legal authority holding that a RICO enterprise requires a hierarchical structure beyond that commonly found in contractual relationships. *See, e.g., In re MasterCard International Inc. Internet Gambling Litig.*, 132 F.Supp.2d 468 (E.D.La. 2001); *800537 Ontario Inc. v. Auto Enterprises*, 113 F.Supp.2d 1116 (E.D.Mich.2000). The Court will revisit this issue following a full briefing by all sides in the Subscriber Track.

9. In an attempt to deflect attention away from the Plaintiffs' allegations, some of the Defendants quote excerpts of the plans to show that the MCOs do disclose information pertaining to the monetary incentives paid to physicians and the definition of "medically necessary" contained in the plans. But for the purposes of a motion to dismiss, the Plaintiffs' factual allegations are taken as true. *Brooks*, 116 F.3d at 1369. Therefore, the Defendants raise a factual dispute beyond the purview of a motion to dismiss.

plan.... The formula or method must produce charges that are not excessive, inadequate, or unfairly discriminatory....").

The filed rate doctrine does not apply to the present case because these states do not appear to conduct administrative oversight in the extensive manner typical of situations implicating the doctrine. For example, unlike utility customers, MCO subscribers (or their employers) presumably have some flexibility to search for varying amounts of coverage at various rates other than a flat rate set by a regulatory regime. Cf. *Taffet*, 967 F.2d at 1494 ("The consumer ... has no legal right to pay any rate other than the one established by the [administrative agency]."). Furthermore, there is no opportunity for public notice and comment prior to the acceptance of the rates. *See Morales v. Attorney's Title Ins. Fund. Inc.*, 983 F.Supp. 1418, 1426 (S.D.Fla.1997) (noting that public input into the rate-making process is an important factor in determining whether the filed rate doctrine applies); *Taffet*, 967 at 1492 (concluding that where an opportunity for public participation in the rate-making process exists, consumers should not be permitted to "sit out the state's rate-making process and then repair to court to play litigation lottery.").

Even if the filed rate doctrine applied, state regulatory regimes naturally can only review rates and policies for their objective reasonableness as applied to every payer of premiums within a given jurisdiction. Although premiums already paid may be a tool for measuring damages (i.e., the difference in value between the coverage promised and that actually provided), the Plaintiffs do not challenge the objective reasonableness of a rate structure per se. Cf. *Morales*, 983 F.Supp. at

1429 (characterizing the plaintiffs' claims as "nothing more than a challenge to Florida's rate structure."). Instead the Plaintiffs charge that the Defendants withheld information concerning internal policies which would have some bearing on the Plaintiffs' personal, subjective decision as to how much they were willing to pay and whether they would select one insurance plan over other alternatives. It was this subjective decisionmaking process that the Plaintiffs submit was corrupted by the Defendants' omissions and misrepresentations. *See Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465, 1472 (5th Cir.1987) (stating that a federal court setting aside a contract tainted by fraudulent inducement "would not interfere with the [federal agency's] rate-making powers."), *amended on other grounds*, 831 F.2d 557 (5th Cir.1987). Cf. *Taffet*, 967 F.2d at 1494–95 (holding that the application of filed rate doctrine to plaintiffs' claims was not affected by defendants' fraudulent statements made to an administrative agency in order to obtain approval of a filed rate).[10]

The Defendants also argue that every litigant is charged with knowledge of the contents of published statutes and regulations, and therefore the Plaintiffs cannot maintain that they reasonably relied on any misrepresentations. *See Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir.1998) (holding that knowledge of a telephone company's billing practices conclusively presumed when that information could be inferred from tariff filings with the Federal Communications Commission). Specifically, the Defendants claim that the Plaintiffs cannot complain that certain practices were not disclosed because they are expressly authorized by the Federal Health

---

10. The Court also rejects the arguments made by Foundation and Humana concerning *Burford* abstention, which Humana calls the "equitable twin of the filed rate doctrine," for the reasons stated in the Court's March 2, 2001 Provider Track Order. *See* 135 F.Supp.2d at 1260.

Maintenance Organization Act.[11] The attendant regulations require HMOs to "have effective procedures . . . . to control cost of basic and supplemental health services," which may include "mechanisms such as risk sharing, financial incentives, or other provisions agreed to by providers." 42 C.F.R. § 417.103(b). In addition, the Defendants argue that their plans are reviewed by state regulatory authorities and that the cost-containment procedures are authorized by state law.

These regulations, however, do not speak to whether the alleged unsavory specifics of the Defendants' procedures were subjected to scrutiny. For example, in view of the Plaintiffs' allegations, it may be that the definition of "medical necessity" acquires an Alice–in–Wonderland flavor, whereby the managed care insurance company manipulates those words so that they mean one thing within the context of regulatory review but something quite different in actual practice.[12] The Defendants' arguments would require a factual inquiry extending beyond the pleadings to verify whether, how and which practices

have been reviewed, certified or statutorily authorized by governmental authorities. Therefore, it would be premature to undertake such an examination at this stage of the case.[13]

■ Defendants Aetna, Humana and Prudential also argue that because HMOs are specifically authorized by Congress to engage in cost-containment practices under the Federal Health Maintenance Organization Act of 1973 ("HMO Act"), 42 U.S.C. § 300e(c)(2)(D), the purported non-disclosure of such practices cannot constitute criminal fraud. The Defendants also rely upon *Pegram v. Herdrich*, 530 U.S. 211, 120 S.Ct. 2143, 2156, 147 L.Ed.2d 164 (2000), to further their argument that the Plaintiffs' allegations do not constitute criminal fraud. *See id.* at 2156 ("The fact is that for over 27 years the Congress of the United States has promoted the formation of HMO practices."). However, as this Court has noted, neither the Congress nor the Supreme Court in *Pegram* wove "all-encompassing cloak of immunity for the health care industry." 135 F.Supp.2d

---

**11.** Defendants also observe that while the Medicare Act requires that financial incentives offered to physicians be disclosed to the Health Care Financing Administration, such matters are only required to be disclosed to Medicare patients upon those patients' request. 42 C.F.R § 417.479(h), (i). Given that none of the Plaintiffs claims to be a Medicare recipient, the reference is at best persuasive authority. Furthermore, Congress may have been motivated by different considerations when it enacted the underlying statute. For example, while consumers in an open market for private healthcare coverage need full access to information in order to make an informed choice, Medicare is a government-run program. Moreover, if the Defendants disclose physician incentives, as they claim they do, a partial disclosure of the incentives may be so inadequate as to fraudulently mislead a prospective subscriber.

**12.** *See* Lewis Carroll, The Annotated Alice: Alice's Adventures in Wonderland & Through

the Looking Glass 269 (Martin Gardner ed., Bramhall House 1960) (1871) (" 'When *I* use a word,' Humpty Dumpty said in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.' ")

**13.** Defendant Foundation emphasizes *United States v. Brown*, 79 F.3d 1550 (11th Cir.1996), in the course of discussing the presumed knowledge doctrine, but that case concerned whether a person of ordinary prudence, who was about to enter into an agreement to purchase a home from a housing developer, would rely solely on the developer's representations about the value or rental income of its homes or instead look to external sources as well. Even if a factual examination of reasonable reliance was appropriate at this time, the defendants in *Brown* did not make misrepresentations or omissions about the concrete quality of the product sold. *Id.* at 1559 n. 15.

at 1258. The deception concerning cost containment practices, rather than those practices themselves, is at issue in this lawsuit. Therefore, the Court concludes that Congress did not intend to immunize the wrongdoing of which the Defendants are accused.[14]

■ Next, Defendants Pacificare, Prudential and Foundation argue that Defendants' statements concerning patient's rights and MCO practices as set forth in distributed handbooks and advertisements were mere puffing and not legally fraudulent.[15] *See Brown,* 79 F.3d at 1556 ("Puffing" or "sellers' talk" is not actionable under the federal mail fraud statute). The mere opinions or exaggerations concerning the qualities of the Defendants' plans would be puffery. However, if the Defendants go beyond exaggeration and assign qualities to the plans which they do not possess, then they have transcended the limits of puffery and engaged in false representations. *United States v. Simon,* 839 F.2d 1461, 1468 (11th Cir.1988) (citing *United States v. New South Farm & Home,* 241 U.S. 64, 71, 36 S.Ct. 505, 60 L.Ed. 890 (1916)).

Many of the statements quoted in the Plaintiffs' complaints are textbook examples of puffery which as a matter of law could not sustain an indictment for fraud. Such statements include "PruCare HMO provides the Rock Solid health coverage you deserve," Williamson Complaint, ¶ 97, and "We are a high performance PacifiCare. Quality is part of everything we do. Nothing less will be accepted," Hitsman Complaint, ¶ 98. However, some statements come much closer to false representation. For example, a 1997 Prudential Handbook states: "If your Primary Care Physician determines that specialty care is necessary, he/she will refer you to a specialist in the Prudential Plus network." This statement could be fraudulent if it would cause a reasonable person to believe that Prudential's policies cover all expenses deemed "necessary" by her primary physician, when in fact Prudential determines which expenses are "necessary." Likewise, PacifiCare's HMO Disclosure and Benefits form proclaims that subscribers have a right to "[c]andid discussion of appropriate or Medically Necessary treatment options for your condition, regardless of cost or benefit coverage." Clearly this issue must await review at a later stage in the proceedings.

■ Finally, although the Plaintiffs have thus far successfully navigated the Defendants' arguments, all of the complaints, save for the *Price v. Humana* complaint, founder upon the rocky shoals of the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." That is, the Plaintiffs must allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1380–81 (11th Cir.1997). However, Rule 9(b) must be

---

14. However, this conclusion does not foreclose the question of whether the Defendants had a criminal intent to defraud as required by the federal mail and wire fraud statutes. *See, e.g.,* Humana Defendant's Motion to Dismiss Subscriber Track Consolidated Amended Complaint, at 28.

15. The *Romero v. Foundation* complaint does not contain any specifically quoted statements made by the Defendant, and is therefore not susceptible to a discussion of puffery.

read in conjunction with Rule 8(a) so as to "not abrogate the concept of notice pleading." *Durham v. Business Management Associates,* 847 F.2d 1505, 1511 (11th Cir. 1988).

The Court finds that the pleadings are imprecise with respect to what dates, times and places the alleged fraudulent misrepresentations were made to the Plaintiffs. In addition, some of the Plaintiffs do not specifically quote any statements made by the Defendants. The Plaintiffs do, however, set forth the nature of the fraudulent scheme with some detail. Therefore, the Plaintiffs rely on the doctrine that "[a]llegations of date, time or place satisfy the Rule 9(b) requirement that the *circumstances* of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule." *Durham,* 847 F.2d at 1512 (emphasis in original) (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984)).

The Court finds that, with the exception of *Price v. Humana,* the Plaintiffs do not meet this less stringent standard of particularity because the complaints do not fully identify which materials were received or which advertisements were actually viewed and relied upon by the individual plaintiffs. The cases relied upon by the Plaintiffs do not lead to a different conclusion. In *Durham,* the Court noted that the alternative means method was successful where an affidavit filed with the Court detailed correspondence by mail between the defendants and plaintiff investors. *Id.* at 1512. In *Colonial Penn Ins. Co. v. Value Rent–A–Car, Inc.,* 814 F.Supp. 1084 (S.D.Fla. 1992), this Court found that the particularity requirement was demonstrated by alternative means because, in addition to supplying the general time frame in which the misrepresentations were allegedly made and describing the alleged scheme in considerable detail, "the complaint specifi-

cally allege[d] that two separate facsimiles were sent to Colonial's agent, Rales, including the date, place of mailing and content of the letters." *Id.* at 1093.

Moreover, *Saporito v. Combustion Engineering,* 843 F.2d 666 (3d Cir.1988), further develops the meaning of *Seville,* the reasoning of which was adopted by the *Durham* court. In Saporito, the court dismissed the RICO fraud-based claim under the alternative means standard because the complaint "did not adequately allege who made the statements ... or who received the allegedly fraudulent information." 843 F.2d at 675. *See also Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 656 (3d Cir.1998) (dismissing RICO fraud claim despite alternative means option because the complaint did not include "specific allegations as to which fraudulent tactics were used against" the plaintiffs, and commenting that "[u]ntil the putative class is certified, ... the First Amended Complaint must be evaluated as to these particular plaintiffs.").

The complaint brought by Plaintiffs Price, Sessa, Katz and Yingling against Humana satisfies the alternative means. For example, the Complaint states:

In 1986, when Ms. Price became a participant in the Humana Plan, she was supplied a description of the benefits by Humana, which represented ... that coverage under her Humana Health Plan would be provided when her medical claims satisfied the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents. The description of benefits concealed from Ms. Price that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided.... On the basis of the information provided by Humana about her medical coverage, Ms. Price continued and paid for her

enrollment in Humana in subsequent years.

Price Complaint, ¶ 17. The remaining Plaintiffs are given leave to file an amended complaint properly pleading fraud with particularity no later than June 29, 2001.[16]

### B. Extortion

 Under the Hobbs Act, 18 U.S.C. § 1951, "whoever ... affects commerce ... by ... extortion shall be fined not more than $10,000 or imprisoned not more than twenty years, or both." Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

The Plaintiffs allege that their doctors, much like the providers in the Provider Track lawsuit under review by this Court, were extorted through fear of economic loss and coerced into accepting contracts and Defendants' policies and monopolistic practices on a "take it or leave it" basis. As a result of this activity, the Defendants are said to have obtained from the providers tangible and intangible property interests to which they are not entitled. This Court recently held that such claims against the providers established *prima facie* predicate acts of extortion. *See* Provider Track Order, 135 F.Supp.2d at 1264. Whether the evidence is sufficient to withstand a motion for summary judgment is a question left open for another day.

The sufficiency of evidence aside, the Plaintiffs' theory of injury appears to be that these predicate acts of extortion committed against their doctors somehow injured the Plaintiffs. Even assuming that harm to the Plaintiffs was proximately caused by the extortion, Plaintiffs appear to allege only intangible injuries to the doctor-patient relationship. *See, e.g.,* O'Neil Complaint at 142 ("Aetna's overt acts and fraudulent and extortionate racketeering activity unlawfully intruded on the physician-patient relationship and defrauded the Plaintiff and Class members of their intangible right to the delivery of honest medical services."). Harm to such intangible property interests does not satisfy the injury requirement of 1962(c). *See, e.g., Connor v. Halifax Hosp. Medical Center,* No. 6:99–CV–1599–ORL–28–JGG, 2001 WL 237191, *14 (M.D.Fla. March 5, 2001) (holding that the "intangible right of honest medical services" does not constitute "property" for purposes of Section 1964).

The Plaintiffs have not pled predicate acts of extortion that tangibly and directly harmed them. Nevertheless, the key inquiry with respect to predicate acts under RICO is whether a plaintiff was directly and tangibly injured in her business or property by the pattern of racketeering activity. A predicate act of extortion which does not directly injure a plaintiff may be aggregated with acts of mail and wire fraud which did directly and tangibly injure the plaintiff to form a pattern of racketeering activity. *See Jones v. Childers,* 18 F.3d 899, 914 (11th Cir.1994) (finding that the plaintiffs "were directly harmed by only two of the many predicate acts upon which they rely is not determinative" of whether they have properly al-

---

16. The Defendants make various arguments relating to materiality, reliance and proximate cause. For example, Defendants Aenta and CIGNA argue that each of their Plaintiffs' employers self-insures and that the MCOs play only an administrative role. Defendant Prudential submits that because Plaintiff Williamson is a dependent enrollee under a plan offered through his wife's employer, his theory of injury rests upon a speculative causal chain. While the Defendants are welcome to revive these arguments at a later date, they are not ripe for adjudication at the motion to dismiss level of review and, thus, cannot be evaluated upon the sparse factual record currently available.

leged a pattern of racketeering activity); *Deppe v. Tripp*, 863 F.2d 1356, 1366 (7th Cir.1988) ( "[A] RICO verdict can be sustained when a pattern of racketeering acts existed, but when only one act caused injury.") There must, however, be a sufficient nexus between the pattern of racketeering activity and the predicate act which directly harmed the plaintiff. Predicate acts are related to each other if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. 3275 (quoting Title X of the Organized Crime Control Act of 1970, 18 U.S.C. § 3575(e)); *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Plaintiffs contend that the Defendants committed extortion against the providers "in furtherance of and for the purpose of executing and/or attempting to execute the ... schema and artifice to defraud or deprive" the Plaintiffs. O'Neil Complaint, ¶ 140. Thus, the Plaintiffs allege the requisite close relationship between the pattern of racketeering activity and the act that harmed the Plaintiffs.

### C. The Travel Act

■ The Travel Act, 18 U.S.C.A. § 1952, establishes criminal liability for one who travels in interstate commerce or uses the mail system, with intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." *Id.* The Plaintiffs have properly pled predicate acts of extortion, and the Defendants do not contest interstate travel or use of the mails. Hence, the Plaintiffs' claim that the Defendants "on numerous occasions traveled and caused others ... to travel in interstate commerce in order to attempt to and to commit ... extortion" is sufficient to allege the Travel Act viola-

tions. O'Neil Complaint, ¶ 144. Nevertheless, given that these predicate acts are dependent upon the Plaintiffs' extortion allegations, the Plaintiffs must demonstrate that they were directly and tangibly injured by the Travel Act violations.

With the exception of the *Price v. Humana* Plaintiffs, the Plaintiffs have not yet properly pled *any* predicate acts which directly and tangibly injured them. Therefore, the Court dismisses without prejudice the Section 1962(c) claims against all of the Defendants, except Humana. The Plaintiffs are given leave to file an amended complaint remedying the deficiencies no later than June 29, 2001.

### CONSPIRACY

#### A. The Section 1962(d) Conspiracy to Violate 1962(c)

The Plaintiffs also allege that the Defendants, in violation of 18 U.S.C. § 1962(d), have conspired to violate Sections 1962(a) and (c). With respect to the conspiracy to violate Section 1962(c), the Plaintiffs allege that each Defendant insurance company "conspired with the other MCOs and with Non–MCO co-conspirators to participate, directly or indirectly, in the fraudulent scheme or artifice alleged herein, to obtain money by false pretenses, and to deprive the Plaintiff and Class members of the intangible right of honest services." In addition, each Defendant "agreed and conspired with its Health Plans to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which [the Defendant] was not entitled through the exploitation of fear of economic loss and/or loss of business."

■ In order to survive a motion to dismiss a Section 1962(d) conspiracy claim, a Plaintiff must allege "that the conspira-

tors agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity." *United States v. Castro,* 89 F.3d 1443, 1451 (11th Cir.1996). Proof of an agreement to participate in a RICO conspiracy can be established by either: (1) "showing an agreement of an overall objective or (2) in the absence of an agreement on an overall objective, by showing that a defendant agreed personally to commit two predicate acts." *United States v. Church,* 955 F.2d 688, 694 (11th Cir.1992), cert. denied, 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992). The requisite agreement may be inferred from the conduct of the participants. *Id.* at 695. Furthermore, proof of an "overt act" is required for a civil RICO conspiracy claim. *Beck v. Prupis,* 162 F.3d 1090, 1099 n. 18 (11th Cir.1998), *aff'd,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

 Since the Plaintiffs failed to properly plead a Section 1962(c) enterprise, the Court dismisses the conspiracy to violate 1962(c) claims without prejudice. *See United States v. Boldin,* 772 F.2d 719, 727 (11th Cir.1985) ("A RICO conspiracy charge requires proof of ... the existence of an 'enterprise.' "). Even absent this defect, however, the Court is troubled by the insufficiency of these conspiracy claims. The conspiracy "with the other MCOs and with Non–MCO co-conspirators" may not be sufficiently pled because the principal co-conspirators are not listed within the four corners of the complaint. Each Defendant must be given adequate notice regarding the principals with whom it allegedly conspired. Furthermore, a

parent corporation cannot *directly* conspire with its subsidiary health plans. As the Supreme Court has observed, "[a] parent and its wholly owned subsidiary have a complete unity of interest," and therefore the idea of a conspiratorial agreement between a parent and its wholly owned subsidiary "lacks meaning." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). *See also Fogie v. THORN Americas, Inc.,* 190 F.3d 889, 899 (8th Cir.1999) ("[W]holly related business entities are incapable of conspiring with one another to violate § 1962(c).").

The Defendants also argue that the allegations of a conspiracy are conclusory and unsupported by factual allegations. *See O'Malley v. O'Neill,* 887 F.2d 1557, 1560 (11th Cir.1989). However, a conspiracy "may be proved by either direct or circumstantial evidence; a common scheme or plan may be inferred from the conduct of the alleged participants or from other circumstances." *U.S. v. Majors,* 196 F.3d 1206, 1210–11 (11th Cir.1999). A final assessment cannot be made as to each Defendant until the Plaintiffs further identify the parties with whom each Defendant conspired. Therefore the Plaintiffs' conspiracy claims are dismissed, but subject to reinstatement if the Plaintiffs successfully re-plead the enterprise and conspiracy.

B. Section 1962(d) Conspiracy to Violate Section 1962(a)

 Section 1962(a) prohibits the investment or improper use of money obtained from racketeering activity.[17] The

---

17. Section 1962(a) states:
 It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Plaintiffs do not plead an actual violation of 18 U.S.C. § 1962(a), but rather allege a conspiracy to violate this section under Section 1962(d).[18] The Plaintiffs plead a separate enterprise for each Defendant which is specially tailored for 1962(a). This "investment enterprise" (e.g., the "FHS Investment Enterprise") is comprised of the insurance company and its health plans. The Plaintiffs each allege that each MCO, "non-MCO co-conspirators, and their multiple agents engaged in this nationwide conspiracy" with the MCO's "Health Plans, and their multiple agents" to violate Section 1962(a).

Some of the Defendants argue that each Investment Enterprise directly conflicts with *United States v. Goldin Indus.*, 219 F.3d 1271, 1275 (11th Cir.2000), because this enterprise is not distinct from the person alleged to have engaged in racketeering activity. Were a subsection (c) enterprise under the microscope, the Defendant would be correct. But the circuit courts have generally distinguished between Section 1962(c) and 1962(a) enterprises, holding that 1962(a) enterprises are not subject to the distinctness restriction imposed on those enterprises arising under 1962(c). *See, e.g., Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir.1995); *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 907 (3d Cir.1991).

The more difficult issue raised by the Defendants concerns whether a plaintiff, in order to have standing to bring a Section 1962(a) claim, must be directly injured by the use or investment of proceeds in a fashion independent of the injury cause by the predicate acts. The majority of circuits to address the issue have adopted the independent injury requirement. *See, e.g., Fogie*, 190 F.3d at 895; *Parker & Parsley Petroleum v. Dresser Indus.*, 972 F.2d 580, 584 (5th Cir.1992). The Fourth Circuit,

however, allows plaintiffs whose injuries flow solely from the predicate racketeering acts to bring a Section 1962(a) claim. *See Busby v. Crown Supply, Inc.*, 896 F.2d 833, 836–40 (4th Cir.1990); *see also Avirgan v. Hull*, 691 F.Supp. 1357, 1362 (S.D.Fla.1988), *aff'd*, 932 F.2d 1572 (11th Cir.1991); *Goold Electronics Corp. v. Galaxy Electronics, Inc.*, 1993 WL 427727 (N.D.Ill.1993). This Court finds Chief Judge King's opinion in *Avirgan*, as well as the Fourth Circuit authority, to be the most persuasive.

In *Busby*, the Fourth Circuit held that RICO's language, the purpose of the statute and Supreme Court interpretations together warrant a rejection of the investment injury requirement. First, Section 1962(a) does not require an investment injury because the "by reason of" language of Section 1964(c) grants compensation for injuries sustained solely under the "receipt of income from a pattern of racketeering activity" statutory language within Section 1962(a). *Busby*, 896 F.2d at 837. Second, a separate investment injury requirement, together with the section 1962(c) person/enterprise distinction, would eviscerate corporate liability because it is nearly impossible to prove that the injury flowed from investment given that the predicate acts usually produce the injury sued upon. *Id.* at 838–39. Finally, the court found support for it position in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) and *American National Bank & Trust Co. v. Haroco, Inc.*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam), which assessed the requirements of 1962(c). Passages from these two cases, phrased in a way applying to section 1962 as a whole, state that injury from the predicate racketeering acts alone is actionable under section 1964(c).

---

**18.** Because the Court will allow the Plaintiffs' RICO conspiracy claims to proceed, it does not reach the common law civil conspiracy claims at this time.

The *Busby* court concluded that the Supreme Court would logically extend these cases to acknowledge standing in a section 1962(a) action without investment injury. *Busby*, 896 F.2d at 839.

This Court already has found that the Plaintiffs properly alleged an injury flowing from the predicate acts. In addition, the Plaintiffs' complaints state that each Defendant used or invested a significant part of the income or proceeds from the operation of its investment enterprise, and this "use or investment injured the Plaintiff and Class members because it permitted such enterprise to continue, expand, and extend its fraudulent schemes and artifices and to acquire other HMO, PPO and POS organizations that were incorporated into the enterprise, thereby increasing its revenue and profits." O'Neil Complaint, ¶ 163. Even under a standard higher than that followed in *Busby*, this allegation is sufficient to state an injury under Section 1962(a). *See Colonial Penn Ins. Co. v. Value Rent–A–Car, Inc.*, 814 F.Supp. 1084, 1095 (S.D.Fla.1992) (Section 1962(a) injury properly alleged where "the investment of the income fraudulently obtained allegedly enabled the Defendants to perpetuate the operation of the enterprise and continue to defraud" the plaintiff); *Avirgan*, 691 F.Supp. at 1362 ("[A] plaintiff's injury may be caused by the operation of the enterprise in which the defendant invested the proceeds derived from the pattern of racketeering activity.").

■ Nevertheless, the Court dismisses these conspiracy claims for three reasons. First, a parent corporation cannot directly conspire with its subsidiaries to violate 1962(a). *See Copperweld*, 467 U.S. at 771, 104 S.Ct. 2731. Second, the Plaintiffs' investment enterprise does not fit within the framework of Section 1962(a). In *National Organization for Women v. Scheidler*, 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), the Supreme Court, in the course of interpreting Sections 1962(a) and (b), stated that the "enterprise in these subsections is the victim of unlawful activity" and must be "an entity that was acquired through illegal activity or the money generated from illegal activity." Obviously each Defendant is not a victim, nor can it acquire itself. Third, aside from the conspiracy with the Health Plans, the Plaintiffs failed to specifically identify those principal individuals and entities with whom the Defendants conspired. Therefore, the Plaintiffs are directed to specifically plead the identities of any principal "[n]on-MCO co-conspirators" of which they are aware. Consequently, these claims will be dismissed without prejudice with leave to re-plead if viable.

## AIDER AND ABETTOR LIABILITY

■ The Plaintiffs allege that the Defendants are guilty of aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c). Title 18 U.S.C. § 2 states: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." This Court recently relied on Eleventh Circuit case law to conclude that there is an implied cause of action for aiding and abetting a RICO violation. *See* Provider Track Order, 135 F.Supp.2d at 1267; *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir.1994). Defendant Foundation respectfully requests that the Court reassess its position on this issue given that the opinion did not fully explore case law outside the Eleventh Circuit.[19] *See* Defendant Foundation Health Sys-

19. On the Provider Track side of the litigation, all of the Defendants, in their Memorandum in Support of Joint Motion to Dismiss Provider Plaintiffs' Consolidated Amended Class Action Complaint, also request reconsideration of this issue.

tems, Inc.'s Filing in Response to Notice Concerning Choice of Law at 4–5. However, where the law of the transferee court jurisdiction is settled, the transferee court should apply the law of that jurisdiction. *See Murphy,* 208 F.3d at 964. Moreover, Defendant Foundation fails to point to any Fifth Circuit precedent which would command a different result if this case is not dismissed, but remanded to the Southern District of Mississippi at the conclusion of the pretrial proceedings. The Plaintiffs sufficiently allege a cause of action for aiding and abetting. For the moment, however, these claims are dismissed because the Plaintiffs have failed to properly plead the requisite predicate acts.

## EMPLOYEE RETIREMENT INCOME SECURITY ACT

The Plaintiffs allege three independent grounds for relief under the Employee Retirement Income Security Act of 1974 ("ERISA"): (1) violations of the insurance company's alleged disclosure obligations as a plan administrator, ERISA §§ 101–104 (29 U.S.C. § 1021 *et seq* ); (2) breach of the general fiduciary duty stemming from the misrepresentation and nondisclosure of plan details, ERISA § 404(a)(1) (29 U.S.C. § 1104(a)); and (3) a claim for benefits due under the terms of the plan, ERISA § 502(a) (29 U.S.C. § 1132(a)). The Plaintiffs assert the same factual scenario of misrepresentation and nondisclosure alleged in connection with their RICO claims. The Plaintiffs locate their right of action for the first and second claims under the "catch all" provision of Section 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)), under which they seek restitution and injunctive relief.[20] The third claim for relief is brought under ERISA §§ 502(a)(1)(B) and 502(a)(3).

## EXHAUSTION OF ADMINISTRATIVE PROCEDURES

The Defendants contend that the ERISA claims must be dismissed because a plaintiff must exhaust administrative remedies before bringing a lawsuit in federal court. *See Mason v. Continental Group, Inc.,* 763 F.2d 1219 (11th Cir.1985); *Byrd v. MacPapers, Inc.,* 961 F.2d 157, 160–61 (11th Cir.1992). This Court must "apply the exhaustion requirement strictly" and "recognize narrow exceptions only based on exceptional circumstances." *Perrino v. Southern Bell Tel. & Tel. Co.,* 209 F.3d 1309, 1318 (11th Cir.2000). The complaints do not allege the absence of administrative procedures (or that the Plaintiffs were denied access to those procedures), nor do the complaints allege that the use of the administrative procedures would be inadequate or futile. Therefore, all of the ERISA claims are dismissed without prejudice with leave to re-plead exhaustion. Nevertheless, the Court will address the merits of the Plaintiffs' claims.

## SUMMARY PLAN DESCRIPTION

The Plaintiffs allege that the Defendants have fallen short of ERISA's requirement that the administrator of an employee benefit plan furnish to each participant covered under the plan a "summary plan de-

---

**20.** Defendant Foundation charges that Plaintiff Romero may not, in her capacity as an individual, assert a claim under Section 502(a)(3) of ERISA for a breach of fiduciary duty. The Supreme Court answered this question in *Varity Corp. v. Howe,* 516 U.S. 489, 507, 509, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (holding that Section 502(a)(3) authorizes an individual lawsuit to remedy a breach of fiduciary duty). The Defendant fails to persuasively distinguish *Varity.* Given that the Plaintiffs seek an injunction to remedy past wrongs and prevent future violations, and that this remedy will suffice to maintain the ERISA claims, the Court at this time does not reach the issues pertaining to the Plaintiffs' requests for other equitable relief.

scription" ("SPD"). ERISA § 101. The statute specifies what information the SPD must contain, including "the plan's requirements respecting eligibility for participation and benefits," the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits" and "the source of financing of the plan and the identity of any organization through which benefits are provided." ERISA § 102(a), (b). Furthermore, the SPD "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." § 102(a). The administrator must similarly provide plan participants with a "summary of any material modification in the terms of the plan." § 104(b).

The Plaintiffs allege that the Defendants improperly failed to disclose certain cost-containment practices in the SPD. Such practices include the use of undisclosed cost-based criteria during the claim review process and a policy of providing cash bonuses and other financial incentives to doctors, nurses and other individuals involved in the claim review process. The financial incentives are allegedly "designed to cause a decrease or stabilization in utilization rates even for services that would otherwise satisfy the medical necessity definition disclosed in [the MCO's] summary plans and other disclosure documents." O'Neil Complaint, ¶ 184. Furthermore, the insurance companies also subcontract the claim review process to third parties who allegedly "use criteria different from and more restrictive than those described in [the MCO's] medical necessity definition, to determine whether to approve or deny claims submitted." *Id.* The Plaintiffs contend that these practices should have been disclosed because they fall within the statutory language requiring disclosure of "the plan's requirements

respecting eligibility for participation and benefits" and "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits," ERISA § 102(a). Hence, the Plaintiffs argue that the Defendants did not "reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." In addition, the Defendants allegedly did not disclose "the source of financing of the Benefit Plans and the identity of any organization through which benefits are provided." O'Neil Complaint, ¶ 183. Finally, the Plaintiffs allege that the Defendants failed to provide timely notification of modifications to the plans in violation of § 104(b). *Id.* at ¶ 185.

The Defendants first argue that they are not "administrators" within the meaning of ERISA §§ 101–104. ERISA defines the term "administrator" in relevant part as "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16). On the other hand, the Plaintiffs allege that each Defendant is a *de facto* plan administrator in its capacity as "an ERISA fiduciary administering, managing and controlling" the health benefit plans pursuant to the authority given by the plan sponsors. O'Neil Complaint, ¶ 183. The Eleventh Circuit recognizes a *de facto* plan administrator category. *Rosen v. TRW, Inc.,* 979 F.2d 191, 193–94 (11th Cir.1992) ("[W]e hold that if a company is administrating the plan, then it can be held liable for ERISA violations, regardless of the provisions of the plan document.").

The Defendant managed care companies are *de facto* administrators if they have discretionary and ultimate decisionmaking authority over the claim process. *Hamilton v. Allen–Bradley,* 244 F.3d 819, 824 (11th Cir.2001); *see also Henderson v. Transamerica Occidental Life Ins. Co.,*

120 F.Supp.2d 1278 (M.D.Ala.2000) (absolving defendant employer of liability, even though it was undisputed that employer was the enumerated administrator, because it had no discretionary control over the outcome of the plaintiff's claim for benefits). This determination "requires an analysis of the facts surrounding the administration of the plan," *Hamilton,* 244 F.3d at 824, and therefore cannot be resolved upon a motion to dismiss.

The Defendants next argue that they are not required to disclose what Plaintiffs allege that they must. Most of the parties' discussion in the pleadings centers on whether the Defendants were required to disclose their cost containment practices, such as cost-based criteria and financial incentives, in the SPD. The argument that these policies should be listed with specificity is belied by the statute's and regulations' silence on cost containment practices. *See Ehlmann v. Kaiser Foundation Health Plan of Texas,* 198 F.3d 552, 555 (5th Cir.2000) ("That Congress and [the Department of Labor] were so capable of enumerating disclosure requirements when they wanted to means that the absence of one regarding physician compensation plans was probably intentional."). In addition, "such a requirement would frustrate the purpose of a summary—to offer a layperson concise information that she can read and digest." *Jones v. Kodak Med. Assistance Plan,* 169 F.3d 1287, 1292 (10th Cir.1999) (citing *Stahl v. Tony's Bldg. Materials, Inc.,* 875 F.2d 1404, 1409 (9th Cir.1989)). Consequently, the Court rejects this basis for finding a violation of ERISA's enumerated SPD requirements.

However, it is apparent that two additional claims made by the Plaintiffs with respect to the ERISA SPD are suffi-cient to repel the motion to dismiss. First, the Defendants do not dispute the Plaintiffs' allegation that they fail to properly disclose the source of financing of the plans and the identity of any organizations through which benefits are provided. *See* ERISA § 102(b). Second, there is a factual dispute concerning the Plaintiffs' claims that the Defendants' allegedly inaccurate description of the medical necessity definition, which would be applied during the review process, violated ERISA's command that the SPD "shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." ERISA § 102(a).

## GENERAL FIDUCIARY DUTIES

The Plaintiffs also contend that the Defendants' alleged misrepresentations and omissions with respect to the plan details constitute a breach of ERISA's general fiduciary duties.[21] ERISA requires that plan fiduciaries exercise a prudent person standard of care when they "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." ERISA § 404(a) (29 U.S.C. § 1104(a)). The Plaintiffs contend that the Defendants "misrepresented that [they] would provide care and treatment on the basis of [the MCO's] medical necessity definition" and actually apply a different standard that was adverse to the interests of the plan members. O'Neil Complaint, ¶ 191. Based upon their allegations of misrepresentation, the Plaintiffs have therefore stated a claim for which relief may be granted. *See, e.g., Varity,* 516 U.S. at 506, 116 S.Ct. 1065 ("To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save ... money at the

---

**21.** The issue of whether the Defendants are fiduciaries may be determined by the inquiry into whether they are *de facto* plan administrators. *See Hamilton,* 244 F.3d at 826.

beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.' ") (citation omitted); *Maez v. Mountain States Tel. and Tel., Inc.,* 54 F.3d 1488, 1499 (10th Cir.1995) (citing cases which hold that "ERISA imposes a duty on plan fiduciaries not to affirmatively mislead plan participants.").

However, the Plaintiffs' contentions that the Defendants failed to disclose material information to the plan beneficiaries do not fare as well as their misrepresentation claims. The Plaintiffs believe that Defendants should have disclosed the fact that the MCOs allegedly: (a) provided direct financial incentives to claims reviewers which are "designed to cause a decrease or stabilization in utilization rates even for services that would otherwise satisfy the medical necessity definition disclosed" in the SPD, (b) contracted with third parties to screen claims based on criteria different from the medical necessity definition conveyed to plan members, (c) employed "hospitalists" to make treatment and coverage recommendations subject to financial incentives designed to shorten hospital stays and (d) created financial incentives to treating physicians "that encourage physicians to advise [patients] not to receive or seek medical services, treatment by specialists and/or in-patient hospital care." O'Neil Complaint, ¶¶ 195–96.

To the extent that the Plaintiffs rely solely on the Defendants' failure to disclose their allegedly improper application of the medical necessity definition, such an allegation is merely a repackaging of their

medical necessity definition misrepresentation claim because every misrepresentation, by definition, omits the truth. Furthermore, Eleventh Circuit precedent holds that absent a specific inquiry by the beneficiary or some other special circumstance, there is no affirmative fiduciary duty to disclose financial incentives paid to physicians or employees in the claims review process. In *Hamilton v. Allen–Bradley Co.,* the Eleventh Circuit held that although a fiduciary must provide complete information in response to a plan participant's questions, the defendant in that case did not have a fiduciary duty to provide claim forms without prior proper solicitation by the plaintiff. 244 F.3d at 827; *see also Ehlmann,* 198 F.3d at 556 ("[T]he text, structure and legislative history of ERISA do not support the imposition of a broad duty to disclose physician compensation plans."); *Weiss v. CIGNA Healthcare, Inc.,* 972 F.Supp. 748, 754 (S.D.N.Y.1997) (holding that the defendant HMO did not breach its fiduciary duties when it failed to disclose its practice of giving physicians financial incentives to lower hospitalization rates and referrals to specialists).[22]

Accordingly, the Court dismisses all of the Plaintiffs' Section 404 omission-based claims. However, improper interference with physician-patient communication could constitute a violation of Section 404. *See, e.g., Weiss,* 972 F.Supp. at 751 (holding that a managed care company's alleged policy of restricting the disclosure of non-covered treatment options, if true, would

---

**22.** The cases primarily relied upon by the Plaintiffs are consistent with the conclusion that the Defendants do not have an affirmative duty to disclose absent a request for information or special circumstances. *See, e.g., Shea v. Esensten,* 107 F.3d 625, 628 (8th Cir. 1997) (holding that a Section 404 fiduciary was required to disclose a physician compensation arrangement where the plan participant asked whether he should see a heart

specialist, the compensation arrangement discouraged the referral the patient had sought, and the patient later died of a heart attack); *Eddy v. Colonial Life Ins. Co. of America,* 919 F.2d 747 (D.C.Cir.1990) (finding liability where fiduciary provided incorrect or misleading information in response to a specific inquiry); *Bixler v. Cent. Pa. Teamsters Health–Welfare Fund,* 12 F.3d 1292 (3d Cir.1993) (same).

"undermine the ability of plan participants to have unfettered access to all relevant information" and thereby constitute a breach of the company's "duty under ERISA to manage the Plan 'solely in the interest of the participants.' ") (citation omitted). Although the Plaintiffs' complaints note in passing the importance of the physician-patient relationship, an explicit recitation of the Plaintiffs' allegations concerning "gag clauses" in physician contracts is absent from their fairly extensive statement of the Section 404 claims. The Plaintiffs are given leave to amend their complaints to clarify whether they are stating a fiduciary claim based upon any purported gag clauses, and, if so, the specific nature of those arrangements.

### CLAIMS FOR PLAN BENEFITS

The Plaintiffs also assert a claim for benefits due under the terms of their benefit plans. *See* ERISA § 502(a) (29 U.S.C. § 1132(a)). However, the Plaintiffs do not claim that they were denied medical coverage benefits in the usual sense. Instead, the Plaintiffs propose a novel "coverage benefit" theory, which posits that the Plaintiffs received coverage of a lesser value than the coverage they should receive under the terms of the plans. O'Neil Complaint, ¶¶ 204–05. The Plaintiffs invite this Court to enter uncharted legal territory, as there is a dearth of any ERISA case law addressing the Plaintiffs' proposition. Moreover, the Plaintiffs offer no compelling rationale in support of this ERISA theory of recovery which, unlike their business-tort, fraudulent inducement sounding RICO injury-in-fact theory, resembles an unripe breach of contract claim. Unless the Plaintiffs re-plead specific claims which were wrongly denied by the Defendants, this claim will be dismissed with prejudice.

### CONCLUSION

For the reasons stated above, it is

ADJUDGED that Defendants' motions to dismiss are GRANTED in part and DENIED in part. The subscriber Plaintiffs may file amended complaints consistent with this opinion no later than June 29, 2001. The Defendants shall have until July 27, 2001 to respond to the amended complaints.